39 LRA 697
5 Utah 138
9 Pac 420
48 Pac 1062

[Crim. No. 196. In Bank.—March 3, 1897.]

THE PEOPLE, RESPONDENT, *v.* WILLIAM HENRY THEODORE DURRANT, APPELLANT.

116 179
116 509
116 567
116 179
118 88

116 179
s119 203
119 428
116 179
123 488
116 179
127 380
116 179
d129 499
a129 505
e129 509
116 179
e132 471
132 636
116 179
134 535
116 179
136 254
116 179
138 488
116 179
140 4
141 531
116 179
142 360
116 179
144 164
116 179
148 350

CRIMINAL LAW — TRIAL — JURY—CHALLENGE TO PANEL—AMENDMENT OF RECORD—TESTIMONY OF PRESIDING JUDGE.—Where a challenge to the panel of trial jurors in a criminal case is made upon the ground of incompleteness in the record kept by the secretary of the judges of the superior court who selected the jury list, the secretary's record is not conclusive evidence of the proceedings, but it is the inherent right of the court to correct the record so as to make it comport with verity; and the testimony of the presiding judge, who was the principal actor in the proceedings, is admissible to prove that the proceedings of the judges in selecting the list were due and regular.

ID.—LACK OF QUALIFICATIONS OF INDIVIDUAL JURORS—DIRECTORY STATUTE.—The fact that some of the numerous jurors selected by the judges did not possess the requisite qualifications is not tenable as a ground of challenge to the panel; but the provisions of section 205 of the Code of Civil Procedure requiring the selection to be made "of persons suitable and competent to serve as jurors" are directory, and a substantial compliance with that section is all that can be required.

ID.—SELECTION OF TRIAL JURORS IN CITIES AND COUNTIES—AMENDMENT OF CODE — CONSTITUTIONAL LAW. — Section 204 of the Code of Civil Procedure was continued in force by section 11 of article XXII of the present constitution, and made applicable to the new judicial system therein provided for; and the amendment made after the adoption of the new constitution, substituting the judges of the superior courts in counties and cities and counties of more than one hundred thousand inhabitants as those required to select and return trial jurors, instead

of the district and other judges originally required to make such selection, in the city and county of San Francisco, was designed to meet the new judicial system provided for by the constitution, and did not become unconstitutional for want of uniform operation under the new constitution.

Id.—Special Venire — Failure to Exhaust Regular Jury List.—The court may summon jurors by special venire without exhausting all of the names upon the regular jury list; and it is not a ground of challenge to the panel thus formed that the regular jury list had not been exhausted.

Id.—Challenges for Actual Bias — Nonexhaustion of Peremptory Challenges—Harmless Ruling—Acquiescence of Defendant.— Where the challenge of two jurors for actual bias was made by the defendant and disallowed by the court, and the defendant failed to exercise his right to challenge them peremptorily, and accepted them both, and it appears that when the jury was completed the defendant had in reserve and unemployed eight peremptory challenges, the ruling of the court in disallowing the challenges for bias will not be reviewed upon appeal, as no injury could have resulted therefrom to the defendant, and the defendant is not entitled to have reviewed an error which he has permitted or acquiesced in by his failure to avoid it by legal means at his command.

Id.—Re-examination of Juror— Peremptory Challenge after Acceptance—Power of Court—Discretion— Abuse not Presumed.—The court has power to permit the re-examination of a juror upon matter coming to the knowledge of the people or defendant after he has been accepted and sworn as a juror, and before the jury is completed, and may, in the exercise of its discretion, permit a peremptory challenge to be interposed after such examination, though the examination may disclose no sufficient ground of challenge for cause; and it will not be presumed to have abused its discretion, nor will its ruling be disturbed, where it cannot be said, under the circumstances shown, that any injury resulted to defendant from the ruling, or that the court abused its discretion.

Id.—Right of Defendant Limited to Impartial Jury — Excuse of Juror—Error in Allowing Challenge.—The only right of the defendant is to a fair and impartial jury, and not to a jury composed of any particular individuals; and when it appears that a fair and impartial jury was obtained, it is the general rule that an error of the court in allowing a challenge and permitting a juror to be excused is not subject to review.

Id.—Homicide — Conviction of Murder — Sufficiency of Evidence — Review upon Appeal.—Where it is not clear that a verdict of guilty upon a charge of murder in the first degree must have been rendered under the influence of passion or prejudice, the verdict must be accepted as the declaration of the jury that any legal evidence offered which was sufficient to warrant the conviction was accepted by them, and the only question of sufficiency of the evidence to justify the verdict which can be reviewed upon appeal is whether any such evidence was offered. The evidence in this case reviewed, and held sufficient to justify the hypothesis of defendant's guilt, and to exclude every other reasonable

hypothesis than that of his guilt, and legally sufficient to support the verdict and judgment of conviction.

ID.—EVIDENCE OF DEFENDANT'S GOOD CHARACTER—INSTRUCTIONS—PRESUMPTION AS TO ACTION OF JURY.—The previous good character of the defendant established by the evidence is a circumstance making strongly in his favor; but where the jury were fully and fairly instructed upon the matter, it must be presumed that the instructions were regarded, and it cannot be said that they disregarded the evidence of the previous good character of the defendant in reaching their verdict.

ID.—MOTIVE FOR CRIME—VALUE OF EVIDENCE—MOTIVE OR ITS ABSENCE AS A CIRCUMSTANCE—PROOF NOT ESSENTIAL.—In every criminal case, proof of the motive or moving cause of a crime is permissible and often valuable, evidence of it being sometimes of assistance in removing doubt and completing proof which might otherwise be unsatisfactory; and it may be proved either positively, or gleaned from the facts and surroundings of the act, in which latter case it becomes a circumstance to be considered by the jury, and its absence is equally a circumstance in favor of the accused, to be given such weight as it deems proper; but proof of motive is never essential or indispensable to a conviction, and where the perpetration of the crime has been brought home to the defendant, the motive for its commission becomes unimportant.

ID.—PUBLICATIONS RELATIVE TO TRIAL—APPLICATION OF DEFENDANT FOR CONTEMPT PROCEEDINGS—POWER AND DISCRETION OF COURT—APPEAL— MOTION FOR NEW TRIAL.—It is not reversible error to refuse applications of the defendant for contempt proceedings against certain newspaper editors because of their publications relative to the trial; but the power to punish for contempt is vested in the court for its own protection, and it may punish as a contempt any publication during the course of a trial which reflects on the court, or assails the litigants, or seeks to intimidate witnesses, or spreads before the jury an opinion on the merits of the controversy, or threatens them with public odium, or attempts to dictate the decision, or in any improper way endeavors to influence the determination; and whether to issue contempt proceedings or not lies in every instance in the sound discretion of the court, and the litigant has no direct appeal from the action of the judge in dealing with the matter, but if, owing to the failure of the court to proceed against the editors, the defendant has failed to obtain a fair and impartial trial, he may raise the question for review by a proper showing upon his motion for new trial.

ID.—PUBLICATIONS HOSTILE TO DEFENDANT—FAIR AND IMPARTIAL TRIAL— JURORS NOT AFFECTED—PROPER REFUSAL OF NEW TRIAL.—The fact that repeated publications in the newspapers of San Francisco, before and during the trial, were extremely hostile to the defendant, and that the newspapers from first to last treated him as the undoubted criminal, and held him up to the public as the guilty man, and that the community was greatly aroused over the atrocious character of the murder, and that the public and public prints were clamoring that punishment should be meted out for the murder, and that all the sensational features of the trial were published daily in the papers, does not conclude the question as to whether the defendant was deprived of the fair and impartial trial guaranteed to him by the constitution; and where it

appears that a fair and impartial jury was obtained, and each juror made solemn affidavit that he did not during the trial read or hear read any of the newspaper articles, statements, or comments published in any of the newspapers concerning the case, and heeded the admonition of the court, and received no impression as to the defendant's guilt or innocence outside of the courtroom, but decided the case after deliberation, solely according to the law and the evidence, to the best of his ability and understanding, and not otherwise, there is no error in refusing a new trial under such a showing.

Id.—Intimidation of Witnesses by Newspapers. — The evidence reviewed, and held not to support the claim that witnesses for the defendant were intimidated and kept from testifying by the hostile publications in the newspapers.

Id.—Evidence—Cause and Means of Death—Opinion of Physician—Expressed Thought.—Where a witness, shown to be a practicing physician and surgeon, who performed an autopsy upon the body of the dead girl, gave evidence of its condition, and expressed his judgment that the cause of death was strangulation, upon being asked what in his judgment was the means used for strangulation, an objection that no foundation had been laid for the question is properly overruled, and the answer: "I think the means used were hands," cannot be stricken out as not responsive to the question, the expressed thought of the expert being clearly his judgment.

Id.—Drapery of Clothing—Dressmaker's Frame.—It is not error for the court to allow the drapery of the clothing of the dead girl upon a dressmaker's frame, as a convenient mode for displaying it, it not being claimed that the frame represented the height, size, or figure of the girl, and the frame itself not being in evidence.

Id.—Cross-examination—Irrelevant Matter—Title to Property not Involved—Prevention of Immaterial Answer.—It is the right and duty of the court to expedite business by curtailing cross-examinations upon immaterial and irrelevant matters of inquiry; and it is not error for the trial judge to interfere to prevent an answer to a question, in whose name the title to property stands, the title to which is not even collaterally or remotely involved in the case, and which answer, if given, the defendant could not impeach, even if it were false.

Id.—Protection of Witness — Interposition of Court—Improper Remark of Counsel.—It is the right of the witness to be protected by the court from irrelevant, improper, or insulting questions, and from harsh or insulting demeanor; and where a lady witness for the prosecution had testified courteously and positively on cross-examination that she had seen the defendant after a date named, it is not fair treatment or legitimate cross-examination of the witness for counsel for the defendant to remark interrogatively, "That is, you imagine you have?" and such action justifies the interposition of the court to reprove the counsel, and protect the witness.

Id.—Admissibility of Photograph—Aid to Jury—Evidence of Likeness—Date of Photograph.—Where a photograph, whether of persons, or things, or places, is shown to be a faithful representation of what it purports to reproduce, it is admissible, as an appropriate aid to the jury in applying the evidence; and where a sister of the deceased

testified that a photograph of the deceased was a fair representation of her sister at the time of her final disappearance, it is admissible, though taken two or more years before th it time.

ID.—DIRECT EXAMINATION OF WITNESS—REFRESHING MEMORY—EVIDENCE UPON PRELIMINARY EXAMINATION.—Where a witness for the prosecution testifies at the trial, upon his direct examination, in variance with the testimony given by the same witness at the preliminary examination, it is proper to allow the district attorney to refresh the memory of the witness by reading the testimony given by him on the same subject at the preliminary examination, to the end that the witness and his present evidence may both be put fairly and in their proper light before the jury; and the prosecution is not bound in such case to wait for the assaults of the cross-examination to expose seeming inconsistencies and discrepancies.

ID.—TESTIMONY OF CHURCH JANITOR—KEYS TO ROOM—PROPER ANSWER.— Where the janitor of the church in which the dead body of the deceased was found was asked by the prosecution, upon his direct examination, if anyone besides himself had a key to his room, his answer to the effect that he had sometimes left his room door locked, and found it open, and therefore concluded that someone had a key to it, cannot be stricken out on motion of the defendant on the alleged ground that the answer tended to cloud the minds of the jury, and necessarily injured the case of the defendant.

ID.—BLOCKS UNDER HEAD OF DECEASED—USE OF BLOCKS IN DISSECTING ROOM— PROPER QUESTION — FAILURE OF PROOF — MOTION TO STRIKE OUT.—Where it appeared from the evidence that blocks were found under the head of the deceased, and that her body was nude and prone upon its back, and that defendant was a medical student, and the demonstrator of anatomy at the medical college attended by defendant had testified as a witness that blocks were employed in relation to dead bodies in the dissecting room, it is proper to allow the witness to be asked for what purposes they were there used, it not appearing whether his answer would not show a use similar to the use made of blocks about the head of the dead girl, and a failure of proof on that point by the answer could only be met by a motion to strike out the answer.

ID.—HYPOTHETICAL QUESTION—MODE OF KEEPING HEAD OF CORPSE UPRIGHT—FORM AND CONTENTS OF QUESTION—IMPROPER SUBJECT OF EXPERT EVIDENCE—HARMLESS QUESTION AND ANSWER.—A hypothetical question put to a physician and surgeon as to what he would do if he wanted to keep the head, face, and neck of a body recently dead in an upright position, before *rigor mortis* should set in, is sufficiently justified as to its form and contents as against an objection that it was not a hypothetical question involving any elements in the case, where the evidence showed that the head of the murdered girl when found was held in an upright position by blocks, it not being required that a hypothetical question shall embrace all the facts in evidence, and it being the privilege of counsel to assume within the limit of the evidence any state of facts claimed to be justified thereby, and base the opinion of an expert upon the facts thus assumed, but the question is objectionable as not being the proper subject of expert evidence, but matter of common sense and common knowledge; but where the answer of the witness was

that he as an individual would place the head in the position desired, and if it did not remain there, would prop it by supports in the desired position, the question and answer are manifestly harmless.

ID.—DIVERSION OF SUSPICION FROM DEFENDANT—FINDING OF CHISEL AND HAMMER—MARKS UPON DOOR AND JAMB—REBUTTAL — TEST BEFORE JURY.—Where a policeman testified for the defense that he found a chisel and hammer in the pastor's study two days after the discovery of the dead body in the belfry of the church, and that there were two marks on the belfry door, to which he tried to fit the chisel; that there was no mark that fitted it exactly, but he could not tell whether the play of the chisel up and down was more than would have ordinarily occurred in using a chisel for prying, and that the hammer had been tried in a mark on the jamb of the door that looked as if it had been struck with a hammer, whereupon the chisel and hammer were offered in evidence, the plain purport of the evidence being to direct suspicion from the defendant to the pastor of the church, it was proper for the prosecution in rebuttal to offer the belfry door and jamb in evidence, after testimony from the officer that they were in the same condition as when he had previously made the test, except the absence of the lock plate, and to ask him to see if he could fit the chisel to the marks in the presence of the jury.

ID.—CROSS-EXAMINATION OF DEFENDANT.—Where the questions interposed and allowed upon cross-examination of the defendant, and the scope of the examination, are within the rules expressed by this court, objections thereto are properly overruled.

ID.—PRELIMINARY QUESTIONS—EXISTENCE OF STATEMENT ADDRESSED BY DEFENDANT TO HIS COUNSEL — ACQUIESCENCE OF DEFENDANT IN ANSWER.—Where, on cross-examination of the defendant as to a statement by him that he had never seen the deceased after the morning of the day upon the afternoon of which she finally disappeared, it is proper for the court to allow preliminary questions as to whether he had not inclosed a statement in a sealed envelope addressed to his counsel, with instructions that it was to be opened if he was convicted, and to be returned unopened if not convicted, and to such preliminary questions the objection that the statement was privileged is not tenable, nor could the court, in overruling the objection, know that the contents of the statement could not be proved by evidence not acquired through a relation of legal confidence; and when the court declared that if the prosecution failed to follow the preliminary inquiry with proper proofs, it would, on motion, strike out the evidence, an answer of the defendant that he made no such statement, to which no motion was addressed to strike it out, must be deemed to have been acquiesced in as presumptively to the advantage of the defendant.

ID.—COMMUNICATION OF DEFENDANT TO REPORTER—ABSENCE OF PRIVILEGE — IMPEACHMENT. — The questioning of the defendant on cross-examination, with proper specifications of time, place, and circumstances, if he had not told a newspaper reporter that he saw deceased upon the second landing, and that she was murdered upon the second landing, is in proper rebuttal of the defendant's direct testimony that he never saw her after the morning of the day on which she disappeared, and does not call for a privileged communication; and, upon

denial by the defendant of the fact of such statement to the reporter, the reporter may properly be called in rebuttal by way of impeachment to testify that the defendant did make such statement.

ID.—IMPROPER REMARK BY CITIZEN TO JUROR—PROCEEDINGS FOR CONTEMPT—PRESENCE OF JURY—OBJECTION ON APPEAL—DEFENDANT NOT PREJUDICED.—The fact that proceedings for contempt were had in the presence of the jury, against a citizen who had made an improper remark to a juror out of court, in the words: "If you don't hang him [meaning defendant], we will hang you" (though the remark was understood by the juror to be jocular, and without serious significance), cannot be objected to on appeal for the first time, there being no request from the defendant to have the jury excused during the investigation, and it appearing that the defendant could not have been prejudiced by the proceedings, the mode pursued being such as to have a salutary, rather than a malign, effect, and it further appearing that each of the jurors reached his verdict solely from a consideration of the evidence.

ID. — ARGUMENT BY DISTRICT ATTORNEY — USE OF PHYSICAL ILLUSTRATION—CAUTION TO JURY.—The use by the district attorney in his argument of an empty box to illustrate the amount of gas which, under the evidence, would leak in a given time, though not commended, cannot be regarded as error, where both the district attorney and the judge were careful to inform the jury that the box was not an exhibit, and they were not to accept the district attorney's statement as evidence.

ID. — REFUSED INSTRUCTIONS SUBSTANTIALLY GIVEN. — Instructions requested by the defendant may be properly refused when they are substantially embodied in the charge given by the court, and the jury is fully and fairly advised by the court upon the subject matter of the requested instructions.

ID.—REQUESTED INSTRUCTION—SAFETY OF ACQUITTAL.—It is not incumbent upon the court to instruct the jury, as matter of law, that "it is safer to err in acquitting"; and where the jury have been carefully instructed as to their duties, and as to the law of reasonable doubt, it is not error to refuse to give a requested instruction embodying that statement, though it correctly states that "justice never required the sacrifice of a victim," and warns against an erroneous conviction.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order denying a new trial.   D. J. MURPHY, Judge.

The latter part of instruction X asked for by the defendant, and refused, and which is referred to in the opinion of the court, was as follows: "It is safer to err in acquitting, and better that many guilty persons should escape, than that one innocent man should suffer.  Justice never required the sacrifice of a victim; an erroneous conviction is calculated to produce incalculable

and irreparable mischief to individuals, to destroy all confidence in the justice and integrity of the tribunals, and to introduce an alarming train of social evils as the inevitable result." The further facts are stated in the opinion of the court.

*John H. Dickinson, Eugene N. Deuprey,* and *Henry E. Monroe,* for Appellant.

The evidence is entirely circumstantial, and will not bear in any way the test of the law as it is established upon the subject of circumstantial evidence. (3 Rice's Criminal Evidence, 545–53, 561–65; Burrill's Circumstantial Evidence, 733–81; Will's Circumstantial Evidence, 173–94; Starkie on Evidence, 9th ed., sec. 586; Cushing on Evidence, 296, 312, 313, 318, 319; Bishop's Criminal Procedure, 3d ed., sec. 1106; Phillips on Evidence, 459, 468; Roscoe's Criminal Evidence, 7th ed., 14; *People* v. *Phipps,* 39 Cal. 326; *People* v. *Anthony,* 56 Cal. 397–400; *People* v. *Travers,* 88 Cal. 233; *People* v. *Padillia,* 42 Cal. 535; *People* v. *Kerrick,* 52 Cal. 447; *People* v. *Carrillo,* 70 Cal. 645; *People* v. *Ferry,* 84 Cal. 35; *People* v. *Brannon,* 47 Cal. 96; *People* v. *Shuler,* 28 Cal. 491; *People* v. *Strong,* 30 Cal. 154; *People* v. *Davis,* 64 Cal. 441, and many other cases.) The unnatural and frightful murder committed created in the minds of the people a sense of horror and overwhelming bitterness, and, under this condition of affairs, circumstantial evidence ought to be acted on with great caution. (3 Rice's Criminal Evidence, 560; Phillips on Evidence, 458–68; Roscoe's Criminal Evidence, 7th ed., 14.) The jury failed to appreciate the principle of law that it is safer to err in acquitting, and better that many guilty persons should escape than that one innocent man should suffer. (3 Rice's Criminal Evidence, 564, 565; Will's Circumstantial Evidence, c. 6, pp. 173–94.) The identity of the accused was not established to a moral certainty beyond a reasonable doubt. (Harris on Identification, secs. 1, 3, 7; 3 Rice's Criminal Evidence, secs. 303, 304; 3 Greenleaf's Evi-

dence, sec. 30; Will's Circumstantial Evidence, c. 47; *Nichols* v. *People*, 17 N. Y. 114; *McCarney* v. *People*, 83 N. Y. 408; 38 Am. Rep. 456; *People* v. *Nelson*, 85 Cal. 430.) The alibi of the defendant was set up from the moment of his arrest, and consistently maintained throughout the subsequent proceedings, and should have been given more weight by the jury. (3 Rice's Criminal Evidence, 420, 422, 427; Wils on Circumstantial Evidence, 168; *Walters* v. *State*, 39 Ohio St. 215; *Blankenship* v. *State*, 55 Ark. 244; *People* v. *Fong Ah Sing*, 64 Cal. 253.) The jury failed to take into consideration the good character of the defendant, which outweighed the other evidence, and which should have raised a reasonable doubt in the minds of the jury as to the defendant's guilt, and thereby have compelled a verdict of acquittal. (*People* v. *Ashe*, 44 Cal. 288; *People* v. *Doggett*, 62 Cal. 27; *People* v. *Shepardson*, 49 Cal. 630; *People* v. *Bowman*, 81 Cal. 566.) The character of the defendant having been proven to be good, the jury should have believed his testimony. (*People* v. *Cowgill*, 93 Cal. 596; *Chambers* v. *State*, 105 Ill. 409; 3 Rice's Criminal Evidence, 159.) From the evidence it cannot be said that no other person than the defendant committed the murder, and it was therefore the duty of the jury to acquit the defendant. (*People* v. *Kerrick*, 52 Cal. 446; *People* v. *Brown*, 56 Cal. 406; *People* v. *Brown*, 59 Cal. 345.) The prosecution failed to show any motive on the part of the defendant for the killing, and it therefore became the manifest duty of the jury to acquit. (*People* v. *Bennett*, 49 N. Y. 137; *Gordon* v. *People*, 33 N. Y. 501; 3 Rice's Criminal Evidence, 444–47, 547.) The court erred in amending the record of the drawing of trial jurors, which did not show compliance with the law, it not appearing that the list of grand jurors was first selected, nor shown that the trial jurors were selected from qualified jurors from the different wards in proportion to their number. (Code Civ. Proc., secs. 205, 206.) Section 204 of the Code of Civil Procedure is unconstitutional, because it has no uniform operation. (Const., art. I, sec.

11.)   The court erred in ordering a special venire without any showing of necessity or exhaustion of names in the trial jury-box. (Code Civ. Proc., secs. 127–214.) The court erred in disallowing the challenge to the jurors Nathan and Crocker, as each of them had formed an opinion which it would require evidence to remove. (*State* v. *Murphy*, 9 Wash. 204; *State* v. *Wilcox*, 11 Wash. 215; *People* v. *Larubia*, 140 N. Y. 87; *People* v. *McQuade*, 110 N. Y. 284; *People* v. *Fredericks*, 106 Cal. 559; *People* v. *Wells*, 100 Cal. 227.) The court erred in permitting juror Brown to be re-examined and peremptorily challenged without good cause. (*People* v. *Reynolds*, 16 Cal. 129.) The court erred in not citing the newspaper editors to show cause why they should not be punished for contempt of court, as the articles published during the trial tended to prejudice the minds of the public and jury. (Rapalje on Contempt, 70; *Myers* v. *State*, 46 Ohio St. 473; 15 Am. St. Rep. 638; *Hollingsworth* v. *Duane*, Wall. C. C. 77, 100, 102; 1 Bishop's Criminal Law, 288; Wells on Jurisdiction, 191; *State* v. *Judge etc.*, 45 La. Ann. 1250; 40 Am. St. Rep. 282; *People* v. *Wilson*, 64 Ill. 195; 16 Am. Rep. 528; *Bayard* v. *Passmore*, 3 Yeates (Pa.), 438, 440; *State* v. *Morrill*, 16 Ark. 384; *In re Sturoc*, 48 N. H. 428; 97 Am. Dec. 626; *People* v. *Freer*, 1 Caines, 518; *In re Crown Bank*, L. R. 44 Ch. Div. 649; *Cooper* v. *People*, 13 Colo. 337; *In re Shortridge*, 99 Cal. 532; 37 Am. St. Rep. 78; *People* v. *Stokes*, 103 Cal. 198; 42 Am. St. Rep. 102; *People* v. *Goldenson*, 76 Cal. 353.) The court erred in overruling the objection on the part of the defendant to the question to the witness Dr. Farnum as to the purpose for which wooden blocks were employed in relation to dead bodies. (See *People* v. *Devine*, 95 Cal. 227; *People* v. *Wells*, 100 Cal. 459; *People* v. *Lee Chuck*, 78 Cal. 317; *Gale* v. *People*, 26 Mich. 161; *People* v. *Cahoon*, 88 Mich. 456; *Leahy* v. *State*, 31 Neb. 566.) The court erred in allowing a statement to be made of a hypothetical case introducing facts of which there was no proof. An opinion based upon such hypothetical statement is error. (Roger's Expert Evidence, sec. 27;

*In re Will of Armes,* 51 Iowa, 596–603; *Hurst* v. *C. R. I. & P. R. R. Co.,* 49 Iowa, 76; *State* v. *Cross,* 68 Iowa, 180–92; *State* v. *Hanley,* 34 Minn. 430–33; Wharton's Criminal Evidence, 9th ed., sec. 418.)

*Attorney General W. F. Fitzgerald* and *Assistant Attorney General W. H. Anderson,* for Respondent.

It was not necessary for the prosecution to show any motive for the commission of the crime by the defendant. (1 Bishop's Criminal Evidence, sec. 1107; *Pointer* v. *United States,* 151 U. S. 413; *Johnson* v. *United States,* 157 U. S. 320; *People* v. *Fish,* 125 N. Y. 136; *People* v. *Trezza,* 125 N. Y. 740; *People* v. *Johnson,* 139 N. Y. 358, 362; *People* v. *Feigenbaum,* 148 N. Y. 636; *State* v. *Coleman,* 20 S. C. 441; *Clifton* v. *State,* 73 Ala. 473; *State* v. *Miller,* 9 Houst. 564; *McLain* v. *Commonwealth,* 99 Pa. St. 89, 99; *Sumner* v. *State,* 5 Blackf. 579; 36 Am. Dec. 561.) If the jury believed the witnesses for the prosecution, it was their duty to distrust, and their privilege to disregard and reject, all of the defendant's testimony. (Code Civ. Proc., sec. 2061, subd. 3; *White* v. *Disher,* 67 Cal. 402; *People* v. *Sprague,* 53 Cal. 491; *People* v. *Hicks,* 53 Cal. 354; *People* v. *Soto,* 59 Cal. 367, 369, 370; *People* v. *Flynn,* 73 Cal. 511, 515; *People* v. *Clark,* 84 Cal. 573, 582, 583.) The only evidence of alibi is the testimony of the defendant himself, and is not sufficient to establish it. (Burrill on Circumstantial Evidence, 517, 518; Wills on Circumstantial Evidence, 171.) All the circumstances proven concur to show that the defendant committed the crime charged, and are inconsistent with any other rational conclusion. This is all the law requires. (*People* v. *Shuler,* 28 Cal. 490; *People* v. *Strong,* 30 Cal. 151; *People* v. *Cronin,* 34 Cal. 202; *People* v. *Murray,* 41 Cal. 67; *People* v. *Anthony,* 56 Cal. 397; *People* v. *Morrow,* 60 Cal. 142; *People* v. *Darr,* 61 Cal. 554, 555; *People* v. *Keeley,* 81 Cal. 210, 213; *People* v. *Urquidas,* 96 Cal. 239.) The weight to be given the evidence as to the good character of the defendant is for the jury, and if they believe the defendant guilty they must so find, notwith-

standing his good character. (*People* v. *Samuels*, 66 Cal. 99, 101; *People* v. *Kalkman*, 72 Cal. 212.)   The presiding judge had the inherent right and power to correct his record to make it correspond to the facts. (*Kaufman* v. *Shain*, 111 Cal. 16, 19, 23; 52 Am. St. Rep. 139.)   The term trial jurors were properly selected in compliance with the law.   (Code Civ. Proc., secs. 204, 205; *People* v. *Young*, 108 Cal. 8, 12.)   The challenge to the special venire was properly denied by the court, as the objection was not based on section 1064 of the Penal Code, and there is no other ground of objection. (*People* v. *Southwell*, 46 Cal. 141; *People* v. *Welch*, 49 Cal. 174, 177, 178; *Bruner* v. *Superior Court*, 92 Cal. 239, 253; *People* v. *Wallace*, 101 Cal. 281–83.)   The court did not err in denying the defendant's challenge to the jurors Nathan and Crocker.   Their opinions, founded upon public rumor or newspaper statements, which could be removed by evidence, were not unqualified, and therefore did not disqualify them as jurors.   (*People* v. *McCauley*, 1 Cal. 379; *People* v. *Reynolds*, 16 Cal. 129; *People* v. *Williams*, 17 Cal. 142, 144, 146; *People* v. *Mahoney*, 18 Cal. 180; *People* v. *Symonds*, 22 Cal. 349, 351; *People* v. *Murphy*, 45 Cal. 137; *People* v. *Brown*, 59 Cal. 345, 354.)   No error can be presumed from the disallowance of a challenge for cause where all the peremptory challenges have not been exhausted. (Thompson on Trials, sec. 120; *State* v. *Groch*, 94 N. C. 987; *State* v. *Hensley*, 94 N. C. 1021; *State* v. *Jones*, 97 N. C. 469; *State* v. *Pritchett*, 106 N. C. 667; *Williams* v. *State*, 30 Tex. App. 354, 368; *State* v. *Le Duff*, 46 La. Ann. 546; *People* v. *Aplin*, 86 Mich. 393; *Brumback* v. *German Nat. Bank*, 46 Neb. 540, 542; *Prewitt* v. *Lambert*, 19 Colo. 7, 9; *Jenkins* v. *Mitchell*, 40 Neb. 664.)   The court did not err in allowing the challenge of Brown, after he had been sworn as a juror, as it was within the discretion of the court so to do.   (*People* v. *Bemmerly*, 87 Cal. 117; *People* v. *Montgomery*, 53 Cal. 576.)   But even if the court did err in allowing the challenge to juror Brown, it is immaterial, as the action of the court is not the

subject of an exception, and is not open to review upon
appeal.    (Pen. Code, sec. 1170; *People* v. *Murphy, supra;
People* v. *Colson,* 49 Cal. 679; *People* v. *Atherton,* 51 Cal.
495.)    The allowance of the challenge to juror Brown,
if error, was error without injury, as the defendant had
not exhausted all of his peremptory challenges when
the jury was finally impaneled.    (*State* v. *Hensley,
supra; State* v. *Jones, supra; State* v. *Aarons,* 43 La. Ann.
406; *Territory* v. *Roberts,* 9 Mont. 12; *People* v. *Fowler,*
104 Mich. 449; *State* v. *Kluseman,* 53 Minn. 541, 544;
*Thompson* v. *Douglass,* 35 W. Va. 337; *State* v. *Ching
Ling,* 16 Or. 419; *Snow* v. *Weeks,* 75 Me. 105; *State* v.
*Cady,* 80 Mo. 413.)    The action of the court in refusing
to cite the newspaper editors for contempt of court dur-
ing the trial was proper.    It was in the discretion of the
court, and its action was not a proper subject of excep-
tion.    (4 Ency. of Pl. & Pr. 766, 767, 774; 3 Am. & Eng.
Ency. of Law, 780; Thompson on Trials, sec. 124.)    It
is manifest that the jury was not influenced by the
newspaper publications, and therefore the defendant
was not injured by the refusal of the court to issue the
citation for contempt.    (*People* v. *Goldenson,* 76 Cal. 328,
353; *People* v. *Murray,* 85 Cal. 350, 361; *People* v. *Murray,*
94 Cal. 212; 28 Am. St. Rep. 113.)    The question asked
Dr. Barrett as to what was the means used for the strang-
ulation was competent, as a proper foundation had been
laid to ask this question of the doctor as an expert.
(Wharton's Criminal Evidence, 9th ed., sec. 412.)
Doctor Barrett's answer that he thought the means used
were hands was proper and responsive to the question.
(*People* v. *Barker,* 60 Mich. 277; 1 Am. St. Rep. 501.)
The question asked Mrs. Vogel as to whether or not she
knew in whose name the title to the property stood was
irrelevant, and properly ruled out.    (*Depuy* v. *Williams,*
26 Cal. 310, 316; *Marshall* v. *Hancock,* 80 Cal. 82–84;
*Taylor* v. *Kelly,* 103 Cal. 178, 186; *Havens* v. *Donahue,*
111 Cal. 297, 301.)    The court did not err in instruct-
ing Mrs. Vogel not to answer the question asked her.
(Thompson on Trials, sec. 352; Rice's Criminal Evi-

dence, 334, 335; 1 Bishop's New Criminal Procedure, sec. 966.) The statement of counsel for the defendant to Mrs. Crossett that she imagined she had seen the defendant was improper, and the judge properly rebuked the counsel therefor. (Rice on Criminal Evidence, 334, 335; Thompson on Trials, sec. 354.) The photograph of the deceased was shown to be a fair representation of her at the time of her death, and was therefore properly admitted. (Rice's Criminal Evidence, 154; Wharton's Criminal Evidence, 9th ed., sec. 544; Thompson on Trials, sec. 869; *Udderzook* v. *Commonwealth*, 76 Pa. St. 340; 1 Bishop's New Criminal Procedure, sec. 1097; *People* v. *Fish, supra.*) The action of the district attorney in reading from the transcript of Mr. King's testimony at the preliminary examination, and asking him if he had so testified, was proper for the purpose of refreshing his memory. (Code Civ. Proc., sec. 2047; *Paige* v. *Carter*, 64 Cal. 489, 490; *Reid* v. *Reid*, 73 Cal. 206, 209; *Burney* v. *Ball*, 24 Ga. 505; *Hulby* v. *State*, 8 Tex. App. 597, 607; *White* v. *State*, 18 Tex. App. 57; *Sisk* v. *State*, 28 Tex. App. 432; *State* v. *Miller*, 53 Iowa, 154, 155; *Hull* v. *Alexander*, 26 Iowa, 569; *Beaubien* v. *Cicotte*, 12 Mich. 459, 468.) The question asked Dr. Farnum as to the purpose for which wooden blocks were used in the medical college in connection with dead bodies was not a subject to general objection. (*Brumley* v. *Flint*, 87 Cal. 473; *Crocker* v. *Carpenter*, 98 Cal. 418, 421; *Colton etc. Co.* v. *Swartz*, 99 Cal. 278.) The hypothetical question asked Dr. Farnum was based on a state of facts reasonably inferred from the evidence, and was therefore proper, as it is not necessary that the facts be proven; any state of facts which it may be claimed the evidence justifies may be assumed. (Thompson on Trials, secs. 604, 606, 608–10; *Harnett* v. *Garvey*, 66 N. Y. 641; *Lovelady* v. *State*, 14 Tex. App. 545, 560; *Guiterman* v. *Liverpool etc. S. S. Co.*, 83 N. Y. 358; *Crowley* v. *People*, 83 N. Y. 464, 470; 38 Am. Rep. 464; *Filer* v. *New York etc. R. R. Co.*, 49 N. Y. 47; 10 Am. Rep. 327; *People* v. *Goldenson, supra; Wint-*

*ringham* v. *Hayes*, 144 N. Y. 1; 43 Am. St. Rep. 725; *Yardley* v. *Cuthbertson*, 108 Pa. St. 395; 56 Am. Rep. 218; *Quinn* v. *Higgins*, 63 Wis. 664; 53 Am. Rep. 305; *Meeker* v. *Meeker*, 74 Iowa, 352; 7 Am. St. Rep. 489.) The action of the court in permitting officer Reynolds to fit the chisel in the mark on the jamb of the door was proper. (*Commonwealth* v. *Sturtivant*, 117 Mass. 122; 19 Am. Rep. 401.) Miss Cunningham's evidence was a clear and direct contradiction of the defendant, and clearly admissible. (Code Civ. Proc., sec. 2051; Rice's Criminal Evidence, 367.) The use of the box by the district attorney was not error. (Thompson on Trials, sec. 992.)

HENSHAW, J.—The defendant, convicted of the murder of Blanche Lamont, prosecutes these appeals from the judgment and from the order denying him a new trial.

Reviewing the specifications of error in their natural sequence, rather than in the order of their presentation in argument, the first which invite attention are defendant's challenges to the panel. He contended that the list of trial jurors had not been selected or returned as required by sections 204–09 of the Code of Civil Procedure. In support of this contention he offered the record of the proceedings of the judges of the superior court in the matter. This record, kept by the secretary of the judges, was incomplete. Under direction of the presiding judge the secretary amended his record, and as amended his minutes showed a compliance with the law. The presiding judge was permitted to testify to the facts attending the selecting and listing of the trial jurors, from which it appeared that the proceedings of the judges were due and regular. Defendant's objection that the original minutes of the secretary were the sole evidence admissible upon the question cannot be sustained. It was the inherent right of the court to correct its records to make them comport with verity. (*Kaufman* v. *Shain*, 111 Cal. 16; 52 Am. St. Rep. 139.)

The secretary's minutes are not made exclusive evidence of the proceedings they undertake to record. It was the duty of the trial judge to determine the facts, and no better evidence could have been offered than that of the presiding judge, himself an actor in and creator of them.

The further objection that the judges failed to comply with the law, in that of the jurors selected some did not possess the requisite qualifications, is equally untenable as a ground of challenge to the panel. (*People* v. *Young*, 108 Cal. 12.) To hold mandatory the provisions of section 205 of the Code of Civil Procedure, and thus to require of the judges the strictest compliance with the law in the matter of the selection of jurors, would be, to the last degree, unreasonable. They would then be obliged to lay aside all other business and devote their time for days, and perhaps weeks, to personal inquiry, inspection, and examination of three thousand six hundred men (the number of jurors called for), and after this labor to decide, at the peril of a rejection of the whole panel, that to the final name upon the list each man possessed all the qualifications of a juror. The provisions of the section are directory, and a substantial compliance with them is here shown, and is all that may be demanded.

Section 204 of the Code of Civil Procedure provides that in counties and cities and counties of more than one hundred thousand inhabitants the judges of the superior court shall select and return trial jurors. Though the section was amended in 1881, and again in 1893, the provisions relative to cities and counties of over one hundred thousand inhabitants continued unchanged so far as affects this consideration. Before the present constitution went into operation, the jurors were selected by the district judges of the several judicial districts within the city and county of San Francisco, the county judge, the probate judge, and the judge of the municipal criminal court. The amendments to the section made after the adoption of the present constitution were

designed to meet the new judicial system provided for
by that instrument. This section was a part of the code
before the adoption of the existing constitution, and by
that instrument (Const., art. XXII, sec. 11) all laws
relative to the judicial system then in force were made
applicable to the new system therein provided for. Sec-
tion 204 of the Code of Civil Procedure was not uncon-
stitutional under our earlier organic law, and did not
become unconstitutional by virtue of the present one.
To the contrary, the section was expressly retained in
force.

The court summoned jurors by special venire. To
the panel thus formed defendant objected. The objec-
tion was not based upon section 1064 of the Penal Code,
but upon the ground that the regular jury list had not
been exhausted. This is not a ground for challenge.
(Code Civ. Proc., secs. 226, 227; *Levy* v. *Wilson*, 69 Cal.
111; *People* v. *Vincent*, 95 Cal. 425.) The court may
summon jurors by special venire without exhausting all
of the names upon the regular list.

To the jurors Crocker and Nathan challenges were
interposed for actual bias, under subdivision 2 of section
1073 of the Penal Code. The challenges were disal-
lowed. Whether or not the jurors Crocker and Nathan,
or either of them, were shown to be disqualified by
actual bias against the defendant, and, therefore, whether
or not the trial court erred in disallowing the challenges
interposed to them, is not, under the facts presented by
the record, a subject for consideration by this court.
The challenges for cause having been disallowed, the
defendant did not see fit to exercise his right of peremp-
tory challenge upon either of the jurors, but accepted
them both. When the jury was completed, defendant
still had in reserve and unemployed eight of his twenty
peremptory challenges. It has in this state been held
in numerous instances that if the judge errs in disallow-
ing a challenge for cause, and the defendant thereafter
excuses the obnoxious juror under a peremptory chal-
lenge, and the jury is completed without the exhaustion

by the defense of all of its peremptory challenges, the error of the court will not be reviewed upon appeal, because no injury could have resulted to the defendant. (*People* v. *Gatewood,* 20 Cal. 146; *People* v. *Gaunt,* 23 Cal. 156; *People* v. *Weil,* 40 Cal. 268; *People* v. *McGungill,* 41 Cal. 429.)

The situation here differs somewhat from that presented by the cases last above cited. But the reasoning which governed those decisions is strictly applicable to present consideration. The defendant may not have reviewed an error which he has invited or has failed to avoid by the legal means at his command. If the defendant feared to put himself upon trial before the jurors whom he had challenged, it was his duty to have availed himself of the liberal aid which the law affords, and to have excused them from the box. If, in so doing, he lessened the number of his peremptory challenges to such an extent that it appears they were exhausted before the completion of the jury, he may well be heard to urge in argument that by reason of the erroneous ruling the number of his peremptory challenges was improperly curtailed, and he was deprived of a legal right; but, if it is shown, as here, that the two jurors in question were accepted and allowed to remain, when the defense could have exercised peremptory challenges upon them, and, further, that at the time when the jury was completed there was still held in reserve by the defense nearly half of its peremptory challenges—if, under these circumstances, error was committed by the trial court, it was either permitted by the defense, or acquiesced in by its failure to exercise its legal right, and the ruling will not be reviewed.

There will be found in the cases some slight diversity of opinion upon the question, but the great weight of authority is in support of the view above expressed. Thompson on Trials, section 120, thus declares the principle: "It is a rule of paramount importance that errors committed in overruling challenges for cause are not grounds of reversal, unless it be shown an objec-

tionable juror was forced upon the challenging party after he had *exhausted his peremptory challenges;* if his peremptory challenges remain unexhausted, so that he might have excluded the objectionable juror by that means, he has no ground of complaint." The rule above stated finds overwhelming support from the authorities, of which a few may be cited. (*State* v. *Gooch,* 94 N. C. 987; *Williams* v. *State,* 30 Tex. App. 354; *State* v. *Le Duff,* 46 La. Ann. 546; *State* v. *Yetzer* (Iowa, April 8, 1896), 66 N. W. Rep. 737; *State* v. *Hartley* (Nevada, May 23, 1895), 40 Pac. Rep. 372; *People* v. *Aplin,* 86 Mich. 393; *Brumback* v. *German Nat. Bank,* 46 Neb. 540; *Prewitt* v. *Lambert,* 19 Colo. 7; *Spies* v. *People,* 122 Ill. 1; 3 Am. St. Rep. 320.)

Nine jurors had been sworn to try the case. At this stage of the proceedings the district attorney sought and obtained permission of the court to reopen the examination of one of these (Brown), and to question him upon matters which had come to his knowledge since his acceptance as a juror. Permission was granted over objection and exception of defendant. At the conclusion of the examination the district attorney asked leave to interpose a peremptory challenge to the juror. Leave was given, and this ruling is assigned as error. Section 1068 of the Penal Code provides that a challenge (either peremptory or for cause) must be taken when the juror appears, and before he is sworn to try the cause, but the court may for cause permit it to be taken after the juror is sworn, and before the jury is completed. It was not error, therefore, for the court to permit a re-examination of the juror upon matters coming to the knowledge of the people or defendant after his acceptance, and before the completion of the jury. The course here pursued was that followed in *People* v. *Bemmerley,* 87 Cal. 117, and approved by this court.

The new matter upon which the juror Brown was questioned touched his connection with the case of one Howell, who had been tried in a federal court for passing counterfeit money. Brown had been a juror in the

case, and with others had voted for Howell's acquittal. The result was a disagreement of the jury and a mistrial. Rumors that the Howell jury had been approached and corrupted were current, and the next federal grand jury instituted an investigation. Brown was summoned before it and interrogated as to his knowledge of the matter, but in justice it should be added that the record before us does not disclose that his own integrity was under assault.

There was undoubtedly not enough in this to warrant the interposition of a challenge for cause; but section 1068 of the Penal Code contemplates also the taking of a peremptory challenge, as was done in this case. When the code says that the court may *for cause* permit the challenge to be taken, it means, as the language has been interpreted, that it is not a matter of right to either party, but may be permitted in the exercise of a sound discretion (*People* v. *Reynolds*, 16 Cal. 128; *People* v. *Montgomery*, 53 Cal. 576; *People* v. *Bemmerley, supra*), and, as said in *People* v. *Montgomery, supra*, in granting or refusing permission it will not be presumed that the court has abused its discretion. In matters not ordered by inflexible rule, no set formula applicable to every case may be laid down to govern and measure the exercise of discretionary power. As each case arises its determination must rest upon its peculiar facts, and what might be an abuse under one set of circumstances might be a fair exercise under another. In every case careful regard will be had to see whether or not the substantial rights of a defendant have been jeoparded or impaired, but, if they have not, then the ruling is not to be disturbed, for at the worst, it could be but a technical error which the courts are commanded to disregard. (Pen. Code, sec. 1404.) Having in view the nature of the district attorney's inquiry and his manifest suspicion that the juror was or had been approachable and venal, it might well be that as a result of the inquiry the juror was left in a state of extreme hostility to the prosecuting officer. He, upon

his part, had failed to establish ground for a challenge
for cause, and, if he could not exercise a peremptory,
challenge, would be compelled to try and to argue his
case before a juror whose attitude naturally was one of
bitter antagonism to him.  It may safely be said that,
however disinterested a juror might be as between the
litigants, no advocate cherishing his client's interests
would willingly accept one whom he believed to be his
personal enemy.  These obvious considerations were
in the mind of the trial judge.  Moreover, the defend-
ant had not exhausted his peremptory challenges.  Four
other jurors were obtained, to none of whom was any
challenge taken by the defense, and, as has been said,
when the jury was finally completed there remained to
the defense unexercised eight of its twenty peremptory
challenges.  The ruling by which the prosecution was
allowed to interpose the peremptory·challenge worked
no hardship to the defendant.  His right was to a fair
and impartial jury, not to a jury composed of any par-
ticular individuals.  When it appears that a fair and
impartial jury was obtained, it is the general rule that
an error of the court in allowing a challenge and per-
mitting a juror to be excused is not subject to review.
(*Territory* v. *Roberts*, 9 Mont. 12; *State* v. *Kluseman*, 53
Minn. 541; *State* v. *Chin Ling*, 16 Or. 419; *Snow* v.
*Weaks*, 75 Mo. 105; *Thompson* v. *Douglass*, 35 W. Va.
337; *John D. C.* v. *State*, 16 Fla. 554; *State* v. *Ward*, 39
Vt. 225; *Watson* v. *State*, 63 Ind. 548; *Tatum* v. *Young*,
1 Port. 298; *Richards* v. *State*, 36 Neb. 17.)

It cannot be said, under the circumstances shown, that
any injury resulted to defendant from the ruling, or
that any abuse of discretion is shown.  (*People* v. *Arceo*,
32 Cal. 40; *People* v. *Murray*, 85 Cal. 350; *People* v.
*Murphy*, 45 Cal. 137.)

The contention of appellant next to be considered is,
that the evidence is insufficient to justify the verdict,
and that the verdict is contrary to the evidence in this,
that the evidence fails to show how, when, or where

Blanche Lamont was murdered, or that the defendant
in any way was instrumental in causing her death.

No small part of appellant's argument herein is de-
voted to an attack upon the credibility of the witnesses
for the prosecution.    In this attack the personal char-
acters of many are assailed, and the unreliability of the
evidence of nearly all is insisted upon.    It here again
becomes necessary to repeat that arguments touching
the credibility of witnesses and the weight to be given
their testimony, arguments eminently proper to be ad-
dressed to the jury or to the judge upon motion for a
new trial, are not for our consideration.    This court sits
in criminal cases solely for the correction of errors at
law.    If in any criminal case there be evidence adduced
logically tending and legally sufficient to prove the guilt
of a defendant, this court cannot, and will not, disturb
the jury's determination, even under a claim that there
is conflicting evidence which might have raised a rea-
sonable doubt of his guilt.    The province of the jury
in weighing evidence and determining the degree of
credibility to be accorded the testimony of witnesses is,
under the rules of law, exclusive.    A judge may not in-
struct upon matters of fact.    If a witness could abso-
lutely discredit his own testimony by swearing to
opposite statements so that one or the other must be
false, under our laws his testimony is not of necessity
to be rejected.    It is still evidence in the case.    Under
such circumstances the jury must receive and weigh it.
They are bound to look upon it with suspicion and dis-
trust, and *may* reject it.    But, upon the other hand,
they may as they determine accept as true one or the
other of the contradictory asseverations.    Thus, upon
a review of the evidence by this tribunal, we may
not examine with minuteness claims that witnesses are
discredited, or that their testimony is unworthy of be-
lief, or look to see whether some other conclusion might
not have been warranted by the evidence.    (*Blythe* v.
*Ayers,* 102 Cal. 254.)    *Ad questionem juris respondeant
judices, ad questionem facti respondeant juratores;* and

than this no maxim of the old law has been more carefully preserved in its integrity under our system. Where it is not clear that the verdict must have been rendered under the influence of passion or prejudice, our examination of the record is only to determine whether legal evidence has been offered sufficient to warrant a conviction, for the verdict of the jury is their declaration that it is this evidence which has been by them accepted. (*People* v. *Ah Loy*, 10 Cal. 301; *People* v. *Vance*, 21 Cal. 400; *People* v. *Strong*, 30 Cal. 151; *People* v. *Dick*, 32 Cal. 214; *People* v. *Manning*, 48 Cal. 335; *People* v. *Estrada*, 53 Cal. 600; *People* v. *Hurley*, 60 Cal. 74; 44 Am. Rep. 55; *People* v. *Ah Jake*, 91 Cal. 98; *People* v. *Freeman*, 92 Cal. 359.)

The following facts were presented in evidence: Upon April 3, 1895, Blanche Lamont was living with her aunt, Mrs. Noble, in the city and county of San Francisco. She was in person rather tall and slight, and weighed about one hundred and twenty pounds. Her age was twenty-one years. She was a school girl attending the high school and normal school, and upon the morning of April 3d left her home, with her strap of books, to join her classes. She met defendant while on the way (such is his testimony), and he accompanied her for a part of the journey. She was at school during the day's session, and at its close, about 3 P. M., left with the other pupils. She did not return home, and never after that day was seen alive.

Shortly after 9 o'clock upon the morning of April 14th, two police officers and the janitor attempted to open the door leading to the belfry of the Baptist Emmanuel Church. They were prosecuting a search for Blanche Lamont. The knob of the door was gone and the lock mutilated so that the janitor's key could not open it. They forced the door, and one of the officers ascending the stairs found the body of a girl lying on the top landing in the southeastern corner of the belfry. It was that of Blanche Lamont. The body was naked, lying upon its back, the feet close together,

the hands folded upon the breast, the head inclined a little to the left. There were two small blocks, apparently employed to hold the head in an upright position. Decomposition was well advanced, and by medical testimony life had been extinct for about two weeks. An examination and autopsy of the corpse revealed seven finger nail incisions upon the left side of the throat and five upon the right, a depression of the larynx, and a congestion of the trachea, larynx, lungs, and brain. Strangulation was the cause of death. A search brought to light the clothing and apparel of the girl hidden in and about the rough woodwork of the belfry, and also her bookstrap and school-books.

Upon April 15th the defendant was arrested and charged with this murder. At that time Durrant was a young man, twenty-four years of age, a student of the Cooper Medical College of San Francisco, and a member of the signal corps of the National Guard of the state. He was interested in religious work, was an attendant, if not a member, of the Baptist Emmanuel Church, was a member of the Christian Endeavor Society, was assistant superintendent of the Sunday-school, and was librarian of the church library. As is abundantly testified to, he bore the esteem of his fellows as a zealous, earnest, and upright young man of commendable character, and of sincere Christian life. When arrested he was upon service of the signal corps to which he was attached.

Upon the trial his defense was an alibi. He declared that he had seen Blanche Lamont in the morning of April 3d, when she was on her way to school, but never again thereafter; that he himself had gone to his medical college, and there had attended a lecture at the time when, under the contention of the prosecution, the girl had been by him murdered in the church.

By the prosecution it was shown that Blanche Lamont was a regular attendant of the Emmanuel Church, and belonged to the society of Christian Endeavor, of which Durrant was also a member. The two were well

acquainted. Indeed, they seem to have stood in their intercourse upon terms of cordial and trusting friendship. They met at religious and social gatherings, to or from which Durrant frequently escorted the girl, in company with her sister and others of their social circle. Durrant had a key to the side door of the church, was thoroughly familiar with the building and premises, and frequently visited them.

Mrs. Mary Vogel lived across the street from the school which Blanche Lamont was attending. She saw defendant a little after 2 o'clock of the afternoon of April 3d, in front of the schoolhouse, walking up and down, apparently in waiting. When school closed she noticed two girls coming out together. One of them carried books in a strap. They walked to the corner of the street, where they stopped for a car. The defendant joined them as they were about to board it. One of the girls went inside. The other sat outside upon the dummy. The defendant joined this girl, and seated himself beside her.

Minnie Edwards testified that it was she who accompanied Blanche Lamont from school that afternoon. They were joined by Durrant at the corner. Blanche Lamont and he sat together outside, while she found a seat within the car. Blanche Lamont had her school books with her.

Mrs. Alice Dorgan at the time of these occurrences was a pupil of the same school. Upon that afternoon she, too, saw Blanche Lamont upon the dummy in company with the defendant.

May Lanigan, another of the school girls, also saw the two upon the dummy. This was from five to ten minutes after 3 o'clock.

Mrs. Elizabeth Crossett had known the defendant for about four years. Between half-past three and four o'clock of this afternoon, while she was upon a Valencia street car traveling toward Twenty-fifth street, she saw defendant. He was seated upon the dummy of her car, in company with a young lady whom she did not know,

but whose description answered to that of the murdered girl. The two were in conversation, and left the car at Twenty-first or Twenty-second streets, and walked in the direction of Bartlett street. The Emmanuel Baptist Church is situated upon Bartlett street, between Twenty-second and Twenty-third streets.

Martin Quinlan, between ten and twenty minutes after 4 o'clock of this afternoon, saw the defendant and a young lady, whose description corresponded to that of the murdered girl, and who carried a loose package in her hand by a string or strap, walking along Bartlett street from Twenty-second street toward Twenty-third street. They were upon the same side of the street as the church, and were walking toward it.

Mrs. Caroline Leake lived upon Bartlett street almost directly opposite the church. She had been an attendant there at divine service for many years. She had known defendant for the past three or four years. She also knew Blanche Lamont. Between four and half-past four of this afternoon she saw Durrant and a young lady pass through the gate into the churchyard, and on toward the side door. His companion she could not identify positively, but from her appearance thought at the time that it was Blanche Lamont, or another young lady of similar size and height. This young lady testified that she was not with defendant at any time upon that day, and no pretense is made that she was.

George King was a member of the church and its organist. He knew defendant, and the two were very friendly. At 5 o'clock on this afternoon he entered the church by the front door, letting himself in with his key. He noticed a strong smell of gas, and went forthwith to the library to see if it was escaping there. He failed to find the leak. Thence, closing the library door, he proceeded directly to the Sunday-school room, and sitting at the piano began to play. He played for two or three minutes, when defendant came through the folding doors to the rear and stood looking at him. "I asked him

what was the matter, because of his pale condition. He had his coat off, and his hat off. His hair was somewhat disheveled. He came through and then told me that he had been fixing the gas above the auditorium, and had been overcome by it to such a degree that he could hardly descend the ladder. He seemed ill. He handed me a fifty-cent piece and asked me to go and get some bromo-seltzer." Witness procured the seltzer and upon his return found the defendant either standing in the lobby or lying upon the platform in the Sunday-school room. He thinks, however, that defendant was lying down. Defendant took a dose of the seltzer, which seemed to nauseate him somewhat. The two sat and talked together for a few minutes, then went upstairs to the choir loft and carried down a small organ. Defendant appeared weak and had to stop two or three times to rest. Then they went to the library door, which Durrant unlocked, and entering put on his hat and coat, which were lying on a box in the corner. Witness had not seen the hat or coat when he went into the library the first time that afternoon. They then left the church and walking some distance together separated, and went to their respective homes. It was then about 6 o'clock.

Upon the morning of April 13th, ten days after the disappearance of Blanche Lamont, and one day before the discovery of her body, her aunt, Mrs. Noble, received through the mail a package which contained all of the rings worn by her when she left her home. The rings were inclosed in a copy of a daily newspaper, the *Examiner*, and upon the paper were written the names of George King and Professor Schernstein. King was a common friend of Durrant and Blanche Lamont. Professor Schernstein was her music teacher. Neither of the two wrote the names. The paper and wrapper were exhibited to the jury, together with admitted exemplars of defendant's writing.

Upon a morning between the 4th and 10th of April, Adolph Oppenheimer, a pawnbroker, was offered for

sale a gold ring containing a diamond chip.  The ring was identified as one worn by Blanche Lamont at the time of her disappearance, and subsequently returned to her aunt through the mail.  The person offering the ring for sale was the defendant.

William Phillips testified that upon a day in the first part of April he saw defendant standing in front of Oppenheimer's place, between 10 and 11 o'clock in the morning.

Dr. G. F. Graham was a student and classmate of Durrant's at the Cooper Medical College.  From 3:30 to 4:15 P. M. of April 3d, Dr. Cheney of that college delivered a lecture to his class upon the sterilization of milk.  Dr. Graham attended that lecture and took notes of it.  The defendant, in support of his alibi, claimed to have attended the lecture, and likewise to have taken original notes, which were admitted in evidence.  Dr. Graham testified that after Durrant's arrest, and before the trial, he visited him with a friend.  Durrant requested his companion to withdraw that he might talk to Dr. Graham alone.  When he had done so, defendant informed Dr. Graham that he had no notes of the lecture, and requested the doctor to lend him his, saying that if he could get them he could establish an alibi.  Defendant told him that he could take the notes to Durrant's house, get his book and put them in it, and the book could be brought to him in jail, or that the witness could commit his notes to memory, come to the jail and repeat them to him.

This summarization of the evidence is not designed to be exhaustive.  Much that is cumulative upon the part of the people is omitted.  No analysis is made of the alibi of the defense, nor of the claim of the prosecution that when not completely demolished it stands upon the unsupported word of the defendant.  Enough has been set forth to show that the verdict and judgment find support from legal and sufficient evidence, and when that point is reached the inquiry of this court comes to an end, saving in those exceptional cases,

of which this is not one, where the evidence against the defendant is so slight as to make clear the inference that the verdict must have been rendered under the influence of passion or prejudice. (*People* v. *Vance, supra; People* v. *Hamilton,* 46 Cal. 540; *People* v. *Manning, supra.*)

By this evidence the defendant and Blanche Lamont, she with her strap of books, entered the Emmanuel Church at about half-past four o'clock in the afternoon of April 3d. At 5 o'clock defendant is seen there, and explains his distressed condition as caused by the inhalation of gas. At 6 o'clock he leaves the church. Blanche Lamont is never again seen alive. Two weeks after her nude and decomposing body is found in the church. She had been strangled and her corpse dragged to the belfry. The clothes which she wore on leaving home are secreted about the floors and rafters. Her books are found, still tightly strapped. These facts, with the others set forth, are sufficient to justify the hypothesis of defendant's guilt, and to exclude every other reasonable hypothesis than that of his guilt. Such evidence is clearly sufficient to warrant and uphold the determination that the girl was strangled to death at the hands of the defendant upon the afternoon of April 3d.

The evidence of defendant's previous good character, so fully established, was a circumstance making strongly in his favor. We are asked to say that the jury disregarded it in reaching their verdict, but this we cannot do. They were fully and fairly instructed upon the matter, and it must be presumed that the instructions were regarded.

Appellant further urges that the evidence fails to disclose any motive for the crime; that proof of motive is essential to support a conviction, and that, therefore, the judgment must be reversed. If by this is meant that proof of a particular motive must be as clear and cogent as proof of the crime, the proposition finds no support in either reason or authority. To the act of

every rational human being pre-exists a motive. In every criminal case, proof of the moving cause is permissible, and oftentimes is valuable; but it is never essential. Where the perpetration of a crime has been brought home to a defendant, the motive for its commission becomes unimportant. Evidence of motive is sometimes of assistance in removing doubt, and completing proof which might otherwise be unsatisfactory, and that motive may either be shown by positive evidence, or gleaned from the facts and surroundings of the act. The motive then becomes a circumstance, but nothing more than a circumstance, to be considered by the jury, and its absence is equally a circumstance in favor of the accused, to be given such weight as it deems proper. But proof of motive is never indispensable to a conviction. (*People* v. *Bennett*, 49 N. Y. 137; *Pointer* v. *United States*, 151 U. S. 396; *Johnson* v. *United States,* 157 U. S. 320; *Clifton* v. *State*, 73 Ala. 473; *Sumner* v. *State*, 5 Blackf. 579; 36 Am. Dec. 561.) The well-springs of human conduct are infinite, and infinitely obscure. An act may owe its performance to complex and multitudinous promptings. Who

—"knows each chord its various tone,
Each string its various bias.'

Or the deed may be due to a single dominant impulse. In this case, what the motive may have been it is not the province of this court to inquire.

During the impanelment of the jury, the defense made application for citations against certain newspaper editors to show cause why they should not be punished for contempt, because of their publications relative to the trial. The court refused to interrupt the proceedings to consider the matter then, and postponed action, stating that at a proper time it would, upon request, take such steps as might be contemplated by law. Again, during the impanelment of the jury, the application was renewed, and the court's response was the same. No further request was made, and there the matter was allowed to stand. This is urged as reversible error.

While a contempt proceeding, for convenience, is presented in the cause out of which it grows, it is a separate and distinct matter, and no part of the original case. (*Ex parte Ah Men*, 77 Cal. 198; 11 Am. St. Rep. 263.) Power to punish for contempt is vested in courts for their own protection. Its object is to insure respect for their rules and orders, and obedience to their processes, and freedom from disturbance or interference with the due and regular course of their proceedings. (5 Am. & Eng. Ency. of Law, 780; Thompson on Trials, sec. 124.) A publication during the course of a trial which reflects on the court, or assails the litigants, or seeks to intimidate witnesses, or spreads before the jury an opinion upon the merits of the controversy, or threatens them with public odium, or attempts to dictate the decision, or in any improper way endeavors to influence the determination, is unquestionably a contempt of court (*In re Shortridge*, 99 Cal. 532; 37 Am. St. Rep. 78); but, at the same time, a litigant has no appeal from the action of the judge in dealing with the matter. The litigant may not control this process, which is designed for the protection of the court, and which is to be invoked or not as its discretion may dictate, but which should be employed freely where the interests of justice and the rights of litigants demand it. "The doctrine is well-nigh without exception, that the issuance *vel non* of contempt proceedings lies in every instance in the sound discretion of the court." (4 Ency. of Pl. & Pr. 774). If, by the failure of the court to proceed against the editors, or any of them, defendant has failed to obtain the fair and impartial trial to which the law entitles him, he may make that appear upon his motion for a new trial, and the question will thus come before us properly for review. In this case, the question is raised in the manner indicated, and it will be considered upon its merits in the proper place. )

Numerous objections were made and exceptions reserved to the court's rulings in admitting and rejecting evidence. These rulings have been subjected to critical

examination, including those which in appellant's brief receive no discussion, but are grouped by number and collectively assigned as error. While none, therefore, has been ignored, we will here consider only such as merit particular mention.

(*a*) Dr. Barrett was shown to be a practicing physician and surgeon. He performed the autopsy upon the body of the dead girl, gave evidence of its condition, and expressed his judgment that the cause of death was strangulation. He was then asked: "What in your judgment was the means used for the strangulation?" Objection was made upon the sole ground that no proper foundation had been laid for the question. The objection was properly overruled. The objection does not present the point that the fact sought to be elicited was not the subject of expert inquiry; nor is that proposition argued in the briefs. That being conceded, the objection that a proper foundation for the question had not been laid could not be sustained, when the witness was a physician and surgeon, whose competency had been abundantly shown. The witness answered: " I think the means used were hands." The appellant insists that the court erred in refusing to strike this answer out, as the question called for the witness' judgment, and he only gave his thought. The expressed thought of the expert was clearly his judgment.

(*b*) The clothing of Blanche Lamont, admitted in evidence, was draped upon a dressmaker's frame, which itself was not in evidence. It was not claimed that the frame represented the height, size, or figure of the girl. Error is predicated upon the use of the frame and the refusal of the court to order the garments removed from it. The frame afforded a convenient mode for displaying the wearing apparel, concerning which much testimony was taken. We can discern no more impropriety or irregularity in the plan pursued than would have existed if the garments had been hung upon a clothesline or huddled into a corner.

(*c*) Mrs. Vogel, cross-examined by the defense, and

asked how she fixed the date upon which she saw Durrant as being April 3d, replied that it was because of a postal card which her husband received that day, and which had been directed to 732 Natoma street. "That place we own, but is occupied by tenants. I have never lived there."

"Q. Well, is that your property or your husband's property?   A. What he got is mine, what I got is his.

"Q. Do you understand my question? I asked you in whose name does the title to this property on Natoma street stand?" Here the judge interposed, and, stating that he could see no possible materiality or relevancy to the question, instructed the witness that she need not answer. There was in this no error. Indeed, it is the duty of a court, and one not often enough performed, to expedite business by curtailing cross-examinations upon immaterial and irrelevant matters. We cannot perceive the slightest pertinency to the inquiry. No question of right or title to property was even collaterally or remotely involved, and, had the witness answered, the subject being immaterial matter educed on cross-examination, the defense would have been bound by her statement, without right to impeach it, even had it been false. (Code Civ. Proc., sec. 2048; *People* v. *McKeller*, 53 Cal. 65.)

(*d*) Mrs. Crossett declared that, to the best of her recollection, the young lady whom she saw with defendant wore a broad-brimmed hat, light, with large bows and feathers in front. She did not recognize the hat exhibited to her which had been proved to be the one worn by the dead girl. She was then asked: "Can you tell whether it was a hat similar to that this young lady wore?" Objection was made that the witness had already stated that she could not recognize it. The court permitted the question, saying: "I think they have a right to ask whether there is any similarity, and, if so, what similarity there is between the hat shown to her and the hat she saw the young lady wear." The manifest soundness of the ruling renders comment

unnecessary. The same witness was interrogated on cross-examination as follows

"Q. Have you seen him [Durrant] at all since last September, 1894?          A. Yes, sir.

"Q. That is, you imagine you have?

"*Mr. Barnes.* I object to the question.

"*The Court.* That would not be proper. The lady is telling what she has seen. I do not think when a lady says, 'I have seen him since September,' that counsel has a right to say, 'You imagine you did.' . . . . It disconcerts the witness and throws a very serious doubt upon the statement. You should have the right to cross-examine this witness and all other witnesses, but I do not concede that this is a proper way to do it.

"*Mr. Deuprey.* We will have to take an exception.

"*The Court.* You have your exception, certainly, to every ruling of the court, but I say that this and all witnesses in this court are to be treated fairly.

"*Mr. Deuprey.* I did, sir, treat this witness fairly.

"*The Court.* The court does not believe you have.

"*Mr. Deuprey.* I take an exception to the court's remarks."

Upon this ruling and these remarks error is affirmed. It is the right of a witness to be protected from irrelevant, improper, or insulting questions, and from harsh and insulting demeanor; to be detained only so long as the interests of justice require; to be examined only as to matters legal and pertinent to the issue. (Code Civ. Proc., sec. 2066.) The protection which the code thus affords to witnesses could be more often extended by judges with a salutary effect upon judicial proceedings. The witness, a lady, had testified courteously and positively that she had seen defendant after the date named. The interjection of counsel was not legitimate cross-examination, and justified the interposition of the court.

(*e*) Blanche Lamont's sister, Maud, was living with her at the time of her disappearance. She was shown a picture of Blanche taken about three years before the date of her testimony, and was asked whether or not

the photograph was a fair representation of her sister as
she was upon April 3d.    Over objection and exception
she was permitted to answer.    It is a general rule with-
out contradiction that where the photograph is shown
to be a faithful representation of what it purports to re-
produce, it is admissible as an appropriate aid to the
jury in applying the evidence, and this is equally true
whether the photograph be of persons, things, or places.
(Rice's Criminal Evidence, 154; Wharton's Criminal
Evidence, 9th ed., sec. 544; Thompson on Trials, sec.
869.)    The fact that the photograph was taken two or
more years before the date of the girl's death did not
justify its exclusion after the testimony of the sister that
it fairly represented Blanche at the time of her disap-
pearance.

(*f*)  George E. King, upon direct examination for
the people, testified that when he returned to the church
after buying the bromo-seltzer for Durrant, he found
him either standing in the lobby or lying on the plat-
form in the Sunday-school room, but in which place he
could not remember.    For the purpose of refreshing his
memory, the district attorney, over objection and ex-
ception by the defense, was permitted to read the follow-
ing question and answer from the testimony of the same
witness upon the preliminary examination in the police
court:

" Q.    When you returned what occurred then?    A.
I met Durrant in the vestibule of the church by the
front door, and he took the seltzer and took a dose of
it.    He went into the kitchen to do that."

The witness responded: "I did so testify.    I don't
think that testimony was correct.    In the cross-exami-
nation I was asked if he was not lying on the platform,
and that created a doubt in my mind, and now I am not
sure either way."    The witness would have had the un-
doubted right to read his testimony given upon the ex-
amination for the purpose of refreshing his memory.
(Code Civ. Proc., sec. 2047.)    Such a transcript may at
least be regarded as a private memorandum.    (*Reid* v.

*Reid*, 73 Cal. 206.) When a witness called by a party fails to testify to matters previously within his recollection, or gives evidence in apparent variance with that formerly given, it is not incumbent upon the party producing the witness to wait for the assaults of the cross-examination to expose seeming inconsistencies and discrepancies. While he may not impeach his witness (saving under certain exceptional circumstances), he may with propriety refresh his recollection, to the end that the witness and his present evidence may both be put fairly and in their proper light before the jury. The answer above quoted affords a good illustration of this. The witness admits the discrepancy between his former and his present testimony, and candidly explains it as arising from a doubt created by his former cross-examination. There was here no impropriety and no injury to defendant,

(g) The janitor of the church was asked upon direct examination if anyone beside himself had a key to his room. He replied: "I have sometimes left my room door locked and found it open; therefore, I conclude that someone had a key to it." The refusal of the court to strike this answer out is assigned as error, "because by its nature the answer only had a tendency to cloud the minds of the jury," and "necessarily injured the case of defendant." We are unable to perceive any force in these objections.

(h) The body of Blanche Lamont was found nude and supine, with a small wooden block upon each side of the head, apparently used to hold it in an upright position. Dr. Charles E. Farnum was called for the people, and testified that he was the demonstrator of anatomy at the Cooper Medical College, which defendant attended, and that wooden blocks were employed for purposes in relation to dead bodies. He was next asked: "For what purpose are they used?" Objection was made that the question was irrelevant, immaterial, and incompetent for any purpose. The line of proof sought to be established by the prosecu-

tion was quite apparent.   It was an endeavor to show
by the demonstrator of anatomy under whom defend-
ant was studying, some technical or peculiar use of
wooden · blocks in connection with dissecting-room
corpses similar to the use made of blocks about the
head of the body of the dead girl.   The court could not
foresee the answer, and properly overruled the objection.
For, if the proposition could be established, it was
clearly competent for the people to do so.  · In this,
however, there was a signal failure.   The answer dis-
closed no possible connection between the facts in the
case of the dead girl and the custom of the dissecting-
room.   While the question was pertinent, the answer
therefore failed to furnish the required proof.   It would
unquestionably have been stricken out on· motion of
the defense.   But no motion was made—doubtless be-
cause the answer not only worked no injury to the de-
fense, but was an affirmative advantage to it.

The record next discloses the following question, ob-
jection, exception, and answer.

" Q.   Let me put a hypothetical case to you for a mo-
ment: Suppose you had in your custody or care a body
which had but recently died, and it was still almost
warm with life.   You are acquainted with anatomy and
surgery, and you know that in a certain length of time
*rigor mortis* would set in, when the body and the mem-
bers of the body would become stiff.,  Now, if you wanted
to keep the head—the face and neck—in an upright
position, in a straight position, not turned to one side
or the other, what would you do in order to keep it in
that position ?

" *Mr. Deuprey.*   We object to that as not a hypotheti-
cal question involving any elements in this case.

" Objection overruled.

" Defendant excepts.

" A.   I would place it first in the position in which I
wanted it, and, if it did not remain there, I would prop
it by supports in the desired position. . . . . My last
answer is what I as an individual would do."

The objection, it will be noted, is not upon the ground that the inquiry is not a subject of expert evidence, but is based upon the one proposition " that the hypothetical question does not involve any elements in the case." In strictness, therefore, this consideration might begin and end with a disposition of the single ground of objection argued, and when it appears, as by fair inference it does, that someone had murdered the girl, and that someone was present with her still warm body, and that someone placed the blocks for the purpose of holding the head upright, it certainly cannot be said that none of the elements of the case was involved in the hypothetical question. Indeed, while counsel for the appellant arguing this proposition strenuously insist that " there is no evidence in the record that any person wanted to keep the head, the face, or the neck in an upright or any position, or in a straight position, not turned to one side or the other, there was nothing in the way of circumstance or in the way of fact established that would permit the presumption of the conditions forced into the so-called hypothetical question "—we need but turn back four pages of their brief to find the curiously destructive declaration that "the fancy struck the murderer of this girl to place the head in a certain position—and he did the most natural thing in the world, picked up a couple of small blocks, evidently lying near, to hold the head in a certain position desired."

Moreover, a hypothetical question need not embrace all the facts in evidence, or even be limited to facts proved. It must be based upon facts in evidence, but may be addressed to any reasonable theory which may be taken of them. In *Filer* v. *New York Cent. R. R. Co.*, 49 N. Y. 46, 10 Am. Rep. 327, it is well said: " It is the privilege of counsel to assume, within the limits of the evidence, any state of facts which he claims the evidence justifies, and base the opinion of experts upon the facts thus assumed. The facts are assumed for the purpose of the question, and for no other purpose."

In Thompson on Trials, section 604, the rule is thus aptly and succinctly stated: "The rule, then, is that the hypothetical questions must be based either upon the hypothesis of the truth of all the evidence, or upon a hypothesis specially framed of certain facts assumed to be proved for the purpose of the inquiry. Such questions leave it for the jury to decide, in the first case, whether the evidence is true or not, and, in the second case, whether the particular facts assumed are or are not proved."

But, as in criminal cases, and particularly in cases of capital crime, the law is reluctant to deny a defendant a full consideration of his points because of technical errors or omissions of his counsel, upon whom he must rely, we pass to the consideration of the proposition that the hypothetical question and its answer were not the subject of expert evidence—a ground of objection not presented to the trial judge. Upon this proposition the defense is undoubtedly correct. A juryman would be absolutely deficient in common sense and common knowledge who did not know that the way to keep an inanimate object in a given position would be to support it by props or stays in that position. And the physician's answer gives expression to this when he says: "That is what I as an individual would do." There was here no question of professional, scientific, or technical skill or knowledge. But the question and answer were absolutely without injury. Not all matters improperly made the subject of expert evidence work harmful error. Where the ultimate conclusion is one to be reached by the jury itself from the facts before it, and so-called expert evidence is allowed which presents to a jury a conclusion other than that to which they might have arrived, the admission of this improper evidence is tantamount to a declaration by the court that they may set aside their exclusive right of judging and accept the judgment of the expert. In such cases injury is apparent. But it frequently happens that under the form of expert evidence answers are given which

are so clearly a part of common knowledge that no injury could have resulted. The answer under consideration is one of them. Had the witness been asked: If you throw a stone into a pond of water, will it float or sink? If you strike a man on the head with an axe, will it injure or benefit him? while the questions do not call for expert evidence, their answers, particularly when, as in this case, they are correctly given, could in the nature of things have worked no harm.

(*i*) The defense showed by police officer Reynolds that two days after the discovery of the body he found a chisel and hammer in the pastor's study in the church, and that he tried the chisel upon the marks. He testified: "My recollection is that there were two marks I tried to fit the chisel to. There was no mark that fitted it exactly; there was a little play; you could move the chisel up and down. I could not tell if there was any more play than would ordinarily have occurred in using a chisel for prying. . . . . I saw a mark on the jamb of that door as if at some time a blow had been struck with a hammer. . . . . At some time the hammer was tried in that mark." The defense then introduced the hammer and chisel in evidence. The plain purport of this evidence was to direct suspicion to the minister. In rebuttal the belfry door and jamb were offered in evidence by the prosecution, after testimony from the officer that they were in the same condition as when previously he had made the test, saving for the absence of the lock plate. The evidence was permissible. The witness was then asked to see if he could fit the chisel to the marks. It was objected that it was for the jury to satisfy themselves upon this matter without the intervention of the witness. It is true, the jurors could have made the experiment to their satisfaction without the aid of the officer; but he, having testified to his former experiment, the prosecution was entitled to have him repeat it before the jury. The result would be as the jury determined, either to support or to disprove his oral evidence.

(*j*) The defendant offered himself as a witness, and

told with much circumstantiality and detail how he had spent his time upon April 3d.

Many objections were interposed to questions propounded him upon cross-examination. A minute examination fails to disclose any error in the court's rulings. The questions allowed and the scope of the cross-examination are strictly within the rule expressed in *People* v. *Gallagher*, 100 Cal. 466. One or two of the rulings should perhaps receive more particular consideration. The defendant testified upon direct examination that when he parted with Blanche Lamont upon the morning of April 3d it was the last time that he ever saw her dead or alive, and was asked upon cross-examination if he had not prepared a statement which was put into a sealed envelope addressed to his counsel with the instruction: "To be opened if I am convicted, and to be returned unopened if I am not convicted." To this and several like questions objections were interposed, upon the ground that the statement, if made, was privileged. The court ruled, and properly, that the questions were preliminary. It was the fact and not the contents of the statement which was the subject of inquiry, and no effort was made to extort from the witness any information of the latter. The court further declared that if the people failed to follow this preliminary inquiry by proper proofs it would on motion strike out the evidence. The witness answered that he had made no such statement, and there the matter rested, presumptively to the advantage of the defendant, certainly not to his injury. From the fact that no motion was made to strike out the evidence, it must be concluded that defendant acquiesced in its remaining in the case. (*Cederberg* v. *Robison*, 100 Cal. 93.) The court was further justified in its ruling by the consideration that it could not foretell the line of proof which the people might take in rebuttal. The contents of the statement, while privileged matter between the client and attorney, and all who had acquired knowledge of it through a relation of legal confidence, would not be

privileged if known to one who had acquired his knowledge under other circumstances. The court could not know that it was not some such evidence which would be proposed at the proper time.

The prosecution then asked the witness, with specifications of time, place, and circumstance, if he had not told Miss Carrie Cunningham that he saw Blanche Lamont upon the second landing, and that she was murdered upon the second landing. This was in rebuttal of defendant's testimony that he had never seen the girl after the morning of April 3d. It is argued by appellant's counsel that the communication, if made, was privileged. But, considering that Miss Cunningham was a newspaper reporter, and is not shown to have been the wife or to have stood to the defendant in any other relation of legal confidence, the claim scarcely merits comment.

(*k*) Miss Cunningham, called in rebuttal, was asked whether defendant did or did not make to her the statement above mentioned. It is asserted that the allowance by the court of these questions was a "gross outrage," and "bore down to the ground all the rules of evidence." It was strictly rebuttal evidence by way of impeachment under well-settled rules of law and under the express declaration of section 2052 of the Code of Civil Procedure.

The foregoing are all of the alleged errors in receiving and rejecting evidence which call for especial comment.

It came to the knowledge of the court during the progress of the trial that one H. J. McCoy had said to a juror: "If you don't hang him [meaning defendant], we will hang you." For this flagrant contempt McCoy was at once cited to appear. An examination was held. By this it was disclosed that the language was used jocularly, and without serious significance. At least, so the juror to whom it was addressed testified that he received and understood it. For this contempt McCoy was promptly and properly punished. The proceedings

were conducted in the presence of the jury. This circumstance is now for the first time charged as error. Doubtless, had the defense desired the jury excused during the investigation, the court would have acceded to the request, but no such suggestion was made. We fail to see how the defendant could have been injured by this. The mode pursued, we think, had a salutary rather than malign effect. The claim that defendant could have been prejudiced in the minds of the jury is completely answered by the facts: 1. That it was not the defense which either instituted or conducted the contempt proceedings; and 2. By the affirmative declarations of each of the jurors under oath that he reached his verdict from a consideration of the evidence in the case, and from that alone.

We perceive no abuse of his office or unfairness to defendant in the argument of the district attorney. In showing an empty box to illustrate the amount of gas which, under the evidence, would leak in a given time, both the district attorney and the judge were careful to inform the jury that the box was not an exhibit, that no proof of its capacity was before them, and that they were not to accept the district attorney's statement as evidence. The box was used simply for purposes of illustration, and, while the practice is not commended, its exhibition to the jury could have worked no injury in this case under the cautions of the court, and, in strictness, could no more be regarded as error than would have been the like employment of any ordinary object in the courtroom.

Error is assigned for the court's refusal to give certain instructions proposed by the defense—in number thirty-six. Argument is addressed to but few of them. These will be considered. The others not argued have not been overlooked, but they either contain manifest errors of law, or are so completely covered by those given of the court's own motion, that it may with safety be concluded that counsel's failure to discuss them is a .

tacit recognition that as to them no error was committed.

Of the proposed instructions, number VI was refused because substantially given in the charge of the court. It was so given. Number VIII deals with the danger to be avoided and the caution to be exercised in reaching a conclusion upon circumstantial evidence. Upon this subject, also, the jury was fully and fairly advised by the court.

The propositions of law contained in the first portion of number X were given by the court with more elaboration and exactness than appear in the proposed instruction. It was not error for the court to decline to give the last portion. It is quite true that the law never requires the sacrifice of a victim. But the jurors had been carefully instructed as to their duties, and had been repeatedly told that, unless upon clear and cogent proof, satisfying their minds beyond a reasonable doubt, they believed defendant guilty, it was their duty to acquit him. It was not incumbent upon the court to instruct the jury that "it is safer to err in acquitting." There is not in contemplation of law any such factor of safety for error.

Proposed instructions XI–XVI, upon the subject of alibi, were fully embraced in those given by the court, as was also the law upon the matter of identification. Of the remaining instructions, the same may be said.

It may here be noted that the appellant does not make serious complaint that any of the instructions actually given by the court were erroneous in point of law, but contends that in some instances the propositions which he sought to have laid before the jury were not adequately presented. The jury, however, was ably, carefully, and elaborately instructed, and we can discern no just ground of complaint in this regard.

The grounds for a new trial presented by defendant have for the most part been covered by what has been said. One of them, however, still remains for consid-

eration. This is, that the proceedings were so con-
ducted as to deprive defendant of his constitutional
right to a fair and impartial trial. Under this head it
is urged that, by the repeated publications in the news-
papers of San Francisco, public feeling was unjustly
aroused to bitter hostility against the defendant; that
witnesses, who would otherwise have given valuable tes-
timony in his favor, were so intimidated that either
they refused to testify, or in testifying gave colorless
and worthless evidence, and that the jury itself, im-
pelled by fear, yielded to the public clamor and demand
that the defendant should be convicted. Many hun-
dreds of pages of the transcript are given over to a pres-
entation of the newspaper articles complained of.

The murder of Blanche Lamont was a crime of so
atrocious a character that the community was greatly
aroused. Its ghastly and sensational features were
seized upon with avidity by the newspapers, and daily
paraded and exploited before their horrified readers.
When Durrant was arrested for the crime there was no
reservation of judgment upon their part, but they pro-
ceeded with unanimity to hold him up to the public as
the guilty man. During the trial of the case they vied
with each other in sensational discoveries and proph-
ecies concerning new evidence and strange witnesses.
They maintained throughout the attitude which they
originally assumed, and from first to last continued to
treat defendant as the undoubted criminal. All this the
record presented by appellant abundantly establishes.

But when a community is deeply stirred over the
commission of some appalling crime, and the public
and the public prints are clamoring that punishment
shall be meted out for it, unless we must say that,
under such circumstances, as matter of law, a defend-
ant cannot have the trial guaranteed him by the con-
stitution, such a showing does not conclude the ques-
tion. Under these circumstances all men do not
forsake reason; some still preserve a dispassionate judg-
ment, and if it be made to appear that the defendant

was tried by a jury of such, uninfluenced by aught save the evidence, then in this regard none of his rights has been violated. After rigorous examination by prosecution and defense it appears that such a jury was obtained without exhausting more than three-fifths of defendant's peremptory challenges. Each juror makes solemn affidavit that he did not at any time during the trial of the cause, and while he was impaneled and sworn as a juror, read or hear read any of the articles, statements, or comments published in any of the newspapers concerning this case; that he at all times heeded the admonition of the court given at each adjournment thereof, and was at no time influenced in any way, shape, or manner by any extraneous matter whatever while a juror, either by newspapers, conversations, or public sentiment, if any such sentiment existed; that he received no impression as to the defendant's guilt or innocence outside of the courtroom, but decided the case, after deliberation, solely according to the law and the evidence, to the best of his ability and understanding, and not otherwise.

It cannot be said that there was any error in refusing a new trial under such a showing.

The claim that witnesses for the defense were intimidated and kept from testifying is not supported. It was expected to prove by a witness, Clark, that in the afternoon of April 3d he saw upon a Market street car Blanche Lamont, with a young man not the defendant. Clark was in one of the eastern states during the trial, and his deposition was there taken. It was to the effect that he saw Blanche Lamont and a young man, not answering the description of defendant, together upon a car upon a day in the latter part of March, or the first part of April, but the date he could not fix with positiveness. He said that he believed that he had told a lawyer that it was upon April 3d, but that subsequent consideration had convinced him that he was mistaken in this. There is here no suggestion of undue influence or intimidation.

The witness Lenahan, called by the defendant, testified, from all that appears, precisely as the defense believed he would.

Mrs. Monnier, it is said, was expected to testify that upon the afternoon of April 3d she saw a young man whom she would identify as defendant enter the Emmanuel Church alone; that because of newspaper publications and interviews with her, her husband became afraid that his business would be injured, and between fear and anger so talked with and influenced his wife, "that she became uncertain as to the time." This declaration is made upon the information and belief of defendant. It is not supported nor corroborated. Even the source of affiant's information is not mentioned. It does not appear that Mrs. Monnier was not at all times within reach of process, yet no attempt was made to introduce her testimony. This showing is certainly insufficient to call for a reversal of the case.

Upon a consideration of the whole case we discern no error to the prejudice of any of the substantial rights of defendant, wherefore the judgment and order appealed from are affirmed.

McFARLAND, J., GAROUTTE, J., HARRISON, J., TEMPLE, J., and VAN FLEET, J., concurred.

McFARLAND, J., concurring.—I have signed the opinion of Mr. Justice Henshaw, and thereby concurred in his opinion and in the judgment of affirmance. But while I can see no legal ground for a reversal of the judgment, I desire to say that the conviction of appellant would have been much more satisfactory if he had been tried in some county far beyond the reach of the threatening atmosphere which surrounded him at the place of his trial, and where the active and long continued attempts to forestall judicial inquiry and compel a hostile decision could not possibly have had much force. As the case stands it is somewhat difficult to feel sufficiently assured that outside adverse pressure

did not have some insensible influence. But, whether or not appellant had a substantially fair trial, notwithstanding circumstances which certainly made it difficult for him to have such a trial, is a question which addressed itself, in the first instance, to the presiding judge of the trial court; and it is not so apparent that he abused his discretion in determining that question in the affirmative, as to give this court warrant to reverse the order denying a new trial. As to the other points involved in the appeal, I am clear that no substantial error was committed.

Rehearing denied.

BEATTY, C. J., dissented from the order denying a rehearing.