Thomas F. McNamee v. State of Nebraska.

[Filed March 23, 1892.]

1. **Criminal Law**: New Trial: Assignment of Errors.  Under section 491 of the Criminal Code, as amended in 1881, in assigning the grounds for a new trial it is sufficient to assign the same in the language of the statute and without further or other particularity.

2. **Manslaughter**: Evidence.  One M. was convicted of manslaughter in causing the death of N., an habitue of a house of ill-fame.  It appeared from the testimony that the death of N. was caused by cerebral hemorrhage; that she had been a prostitute for many years and was addicted to the excessive use of intoxicating drinks and morphine; that a little more than two weeks before her death M. had staid with her during the night; that both had been drinking freely; that he struck her a num-

McNamee v. State.

ber of blows with his open hand, from which she recovered in three or four days; that a few days before this occurrence she had crawled through a transom and fallen upon her head, and thereafter, at times, had complained of her head. *Held,* That the proof failed to show that the cause of death was the blow inflicted by M.

3. ———: ———: UPON HYPOTHETICAL QUESTIONS, containing a resume of the evidence being propounded to the physicians called as experts to ascertain the cause of death, they answered, in effect, that they could not tell. *Held,* That the verdict was not sustained by the evidence.

ERROR to the district court for Douglas county. Tried below before ESTELLE, J.

*Gurley & Marple,* and *Frank T. Ransom,* for plaintiff in error, cited: *Simmerman v. State,* 14 Neb., 569; *Preuit v. State,* 5 Id., 377; *Pound v. State,* 43 Ga., 88; *Dillon v. People,* 8 Mich., 357; *People v. Smith,* 26 Cal., 666; *State v. Merrill,* 2 Dev. [N. Car.], 277; *Hatcher v. State,* 18 Ga., 463; 1 Roscoe's Crim. Ev., 137, 155; Wharton, Crim. Ev., secs. 25–56; *Commonwealth v. Shepard,* 1 Allen [Mass.], 581; *McCall v. State,* 14 Tex. App., 362; *Owen v. Owen,* 22 Ia., 274; *State v. Brainard,* 25 Id., 580; *State v. O'Hagan,* 38 Ia., 506; *State v. Mathews,* 20 Mo., 55; *Milton v. State,* 6 Neb., 144.

*George H. Hastings, Attorney General, contra,* cited: Kerr, Homicide, 142; *Montgomery v. State,* 11 O., 424; *State v. Downs,* 91 Md., 19; *Brown v. State,* 110 Ind., 486; *State v. Johnson,* 102 Id., 247; *State v. Smith,* 10 Nev., 106; *People v. Moan,* 65 Cal., 532; *Williams v. State,* 2 Tex. App., 271; Wharton & Stilles' Med. Jur., sec. 834; Wharton, Crim. Law, sec. 152 *et seq.; State v. Morea,* 2 Ala., 275; *Midland Pac. R. Co. v. McCartney,* 1 Neb., 398; Greenleaf, Ev. [14th Ed.], 53; 1 Phillips, Ev., 169; Roscoe's Crim. Pro., 248, subdiv. 2; *Goersen v. Commonwealth,* 99 Pa. St., 388; *State v. Harrold,* 38 Mo., 496;

22

*Stout v. People,* 4 Park. [N. Y.], 71; *State v. Daubert,* 42 Mo., 242; *State v. Adams,* 20 Kan., 311; *Haskins v. People,* 16 N. Y., 344; 1 Bish., Crim. Pro., sec. 491; *State v. Folwell,* 14 Kan., 105; *Russell v. Rosenbaum,* 24 Neb., 769; *Cleveland Pa. Co. v. Banks,* 15 Id., 23; *Weir v. R. Co.,* 19 Id., 213; *H. & G. I. R. Co. v. Ingalls,* 15 Id., 129.

MAXWELL, CH. J.

In April, 1891, the county attorney of Douglas county filed an information in the district court of that county charging the plaintiff in error with the crime of murder in the first degree, in causing the death of Kate Nichols on the 6th day of March, 1891. The defendant was arraigned and pleaded not guilty. On the trial the jury returned a verdict of manslaughter and the defendant sentenced to imprisonment in the penitentiary for ten years.

Objection is made, on behalf of the state, that the alleged errors in the record cannot be considered because they were not pointed out in the motion for a new trial.

The third and fourth assignments of error in the motion for a new trial are as follows:

"Third—Because the verdict is not sustained by sufficient evidence and is contrary to law.

"Fourth—Because of errors of law occurring at the trial."

In the early history of judicial proceedings in this state this court, following the rule adopted by many courts of high standing, required alleged error in the proceedings to be specially pointed out in the motion for a new trial. This rule was productive of great injustice in many cases and the legislature in 1881 passed an act to amend section 491 of the Criminal Code, which provides that "In assigning the grounds of such motion for a new trial it shall be sufficient to assign the same in the language of the statute and without further or other particularity." This statute has been in force for eleven years, and dispenses with a

particular statement of errors in the record.  This objection, therefore, is unavailing.  All errors which appear in the bill of exceptions may be reviewed.

The testimony shows that the death of Kate Nichols was caused by cerebral hemorrhage.  It is contended on behalf of the state that this hemorrhage was caused by blows inflicted upon the deceased on the night of the 18th of February, 1891.  The testimony tends to show that the deceased was an occupant of a house of ill-repute in the city of Omaha; that she was twenty-eight or thirty years of age and had led a life of shame for about eight years; that she was addicted to the excessive use of intoxicating drinks—particularly whisky; that for two or three months before her death she had indulged so freely in the use of liquor as to be almost constantly under its influence; she seems also to have used morphine to a considerable extent.  In the fall of 1890 she had been sick about three months with a pelvic abscess, during which time she had abstained from the use of liquor.  There is also testimony tending to show that about two weeks prior to her death she had fallen down stairs.

One of the witnesses called for the defense testified as to the habits of the deceased as follows:

Q.  What would she drink?

A.  Whisky.

Q.  State whether or not she would go on protracted sprees.

A.  Yes, sir; for a month at a time.

Q.  For a month at a time did you say?

A.  Yes, sir.

Q.  Was she ill while at your house?

A.  Yes, sir; she was ill for three months.

Q.  Do you know what was the trouble with her?

A.  Some womb trouble.

Q.  Did she drink as hard as before and after?

A.  She didn't drink while she was ill—not at all.

Q. When did she begin to drink again?

A. A few weeks after she recovered.

Q. What was the character of her drinking then?

A. Well, she drank continually—the same as she did before.

Q. State if you have seen her under the influence of liquor on more than one occasion.

A. Yes, sir; for weeks at a time.

Q. What would you say with reference to having tried to prevent her from drinking?

A. I did everything to prevent her.

Q. You may mention, if you can recollect, any one precaution that you took in that connection.

Q. I will ask you whether or not you remember of having locked Elsie Williamson (Kate Nichols) in her room on one occasion when she was at your house?

A. Yes, sir; I do.

Q. You may state what you locked her in her room for—why you locked her in her room.

Objected to; sustained.

Q. What was the condition of Elsie Williamson immediately before you locked her in her room?

A. She was intoxicated.

Q. How full was she?

A. Why, she was so she was falling around, and going around the house parading herself.

Q. How long did she stay in her room at this time?

A. About a half a day.

Q. How did she get out?

A. Came out the transom—fell out of the transom.

Q. Fell out through the transom. How did she fall, if you know?

A. Over on her head—head foremost through the transom.

Q. How high is that transom above the floor?

A. Six feet, I think.

Q. State whether or not she complained of her head at any time after this fall.

A. Yes, sir; she did at the time we picked her up, and it bruised her head.

Q. What did you do with her immediately following the fall?

A. Picked her up and put her in bed.

Q. How long did she remain in bed?

A. Four or five days.

Q. State how many times she complained of her head during this time she was in bed.

A. She complained of her head all the time.

Q. Did she locate that pain in any part of her head?

A. Yes, sir; in the temples.

Q. I will ask you what her habits were with reference to taking morphine?

A. Well, she took morphine all the time I knew her— from the time she came to my house.

Q. How did she take it?

A. She took it in large quantities.

Q. What effect did the morphine which she took have upon her?

A. Made her sleepy, and kept her asleep for days at a time.

Q. When was this fall, as near as you can locate it.

A. Somewhere about the middle of January; some time in January, I could not say the date.

This testimony is not denied. After the death of Kate Nichols, who was also known as Elsie Williamson, the body was removed to the basement of an undertaking establishment and a post-mortem examination held under the direction of the coroner. No bruises or marks of any kind indicating violence were found upon the body, but upon removing the skull-cap there was a discharge of five or six ounces of blood and bloody water. On the right side of the head was a large clot of blood about as large as

a person's hand.   The brain also adhered to the mem-
branes.   It is claimed that three distinct hemorrhages had
taken place which the doctors who made the examination
professed to be able to distinguish by reason of the color
of the extravasations.   The surface of the brain 'on the
right side was partially compressed and of a deeper red
color.   No doubt the hemorrhage caused the death of Kate
Nichols, but the cause of the hemorrhage is in doubt.

On behalf of the state it is claimed that on the night of
the 18th of February, 1891, the plaintiff in error inflicted
blows on the woman which caused the injury.   The testi-
mony tends to show that on the night in question the
plaintiff in error roomed with the deceased; that both had
been drinking and that they quarreled; that he struck her
a number of blows.   The proof upon this point is quite
conflicting, but there is no doubt that by reason of the
blows or other cause her face was considerably swollen and
one eye nearly closed for three or four days.   She seems
to have recovered from this in a few days and visited one
or more saloons, and wrote a number of friendly letters to
the plaintiff in error, in effect asking him to call on .her.
No physician was called till the 2d day of March, 1891,
when Dr. Chadwick was called.   She complained of her
head and he prescribed various remedies.   He visited her
during the 4th and 5th of the month and she died on the
6th of the same month.   The doctor, who was a witness on
behalf of the state, testifies:

Q.   On the occasion of your visits to the deceased, upon
Wednesday and Thursday of the week you treated her and
the week of her death, did she say anything to you as to
the character of any injury received by her to her head?

A.   Yes, sir.

Q.   On which day was it?

A.   Thursday afternoon.

Q.   That was the day preceding her death.

A.   Yes, sir.

McNamee v. State.

Q. I wish you would now state what that was.

A. Well I was trying to get at the cause of the headache, or the cause of the head trouble, and after I had asked her a great many questions, and after she had cried and spoke about dying, she then asked me if blows on the head could produce a severe headache, and then I asked her the form of the injuries she had received, and she said she had been struck with the hand, and I asked her if she was knocked against the wall, the bed, or the floor, and she told me she had not been, and I told her then I didn't think they could be.

Q. Did she say how many blows she had received with his fist?

A. No; she didn't say fist, she said hands.

The post-mortem examination seems to have been made simply for the purpose of ascertaining the cause of death, it being supposed that she had died from the use of morphine. So far as we can judge, no great care was taken in conducting the examination. It was conducted in the basement of the building by gas light, and no attempt was made to use the microscope or to make a close scrutiny of the veins and arteries. On the part of the defense, hypothetical questions were propounded to a number of physicians as to the probable cause of death. Two questions of this kind were propounded to Dr. Gapen which were objected to, as not containing a fair statement of the evidence, which objections were sustained. The objections to the third question, however, were overruled and it may therefore be regarded as a fair resume of the cause. It is as follows:

Q. Doctor, I desire to ask you this question: Take a woman twenty-eight to thirty years of age at the time of her death, who, several years prior to her death, was an inmate of a house of prostitution; who about that time was examined by a physician for a sore upon the private part of her body; who, a little less than a year prior to her death,

became an inmate of another house of prostitution, remain-
ing there some seven or eight months; who, during her stay
in such house, was continuously and constantly addicted to
the excessive use of intoxicating liquors, particularly alco-
holic stimulants; who went upon protracted sprees during
that time, remaining drunk for weeks at a time; who took
morphine in large quantities, and on many occasions, with-
out prescriptions from a physician; who during that time,
and while under the influence of liquor, and afterwards
suffered severe headaches, such headaches being of frequent
occurrence; whose appearance and actions during such
time were those of a crazy person; who three days before her
death was at a saloon drinking hot whisky and apparently
in good health; who had headaches two days before
her death and vomited; who talked of her death the
afternoon before she died; at 2 o'clock that afternoon her
pulse was 50 to 52, her pupils were finally contracted, and
respiration normal; who became weaker from that time
on until she sank in a state of coma, dying about half past 2
the following morning. The post-mortem was held on
the day following her death. The brain and other organs
were examined. All of the organs were found to be in a
normal condition except the brain and lungs. Some pleu-
ritic adhesions were found in the right lung, but no signs
of disease were found. The skull-cap was removed and
found unusually attached to the membranes of the brain;
and there was a flow of water, serum, and blood, between
five and six liquid ounces. There was an inflammatory
adhesion between the skull-cap and the membranes cover-
ing the outside of the brain. The membranes of the
right side being quite tense and of a bluish dark or brown-
ish color; those lying on the left side were clear. Then
the brain was removed, detaching it from in front back-
wards. The bones were examined for evidence of fracture,
but none was found. The brain was then taken out and
laid on a table. Additional clots that might have gath-

ered were then washed off and an incision was made from
the fore part backward, putting the membrane that sur-
rounds the brain into two equal divisions; each portion of
the membrane was then detached from the brain.   On one
of her drunken sprees was locked in her room, and during
that time, while under the influence of liquor, jumped
through a transom over the door, striking her head upon
the hall below outside, causing a bruised condition of the
head at the time, said blow upon the head from the fall
through the transom occurring between five and seven
weeks before her death.   Who had suffered for several
months from pelvic abscess, during which time she was
largely confined to her room, not drinking during that time,
but taking large quantities of morphine; who, fifteen days
before her death, had a quarrel with a man in her room one
night, who struck her several blows with his hand upon the
back, shoulders, arms, face, and head, until her eyes, ears,
face, and head were bruised and black; who was confined
to her room for some four days afterwards, during which
time she complained of headaches and suffered pain ; who,
four days afterwards, was around about the house and out
on the streets; who, six days afterwards, said she was well,
and was sewing all day; who, from that time until the
day before her death, was out upon the streets visit-
ing saloons in the city; who, during that time, drank
whiskey, and was under the influence of liquor; who,
after said quarrel, continued to ply her vocation as a
prostitute, receiving company ; who, some two weeks before
her death, fell down a flight of stairs, bruising her head,
accompanied by nose bleeding and unconsciousness; who
went to the office of a physician four days before her death
and complained of severe headaches, and that she was
weak, her tongue was coated, her bowels were constipated,
and that she was sick.   That in the inner side or inner sur-
face of the membrane on the right side there was found
quite an extensive clot, between four and five inches in

length, and three or four inches in width, and one-sixth of an inch in depth, extending from the anterior middle and posterior lobes of the right side of the brain. There was a second and third clot lying upon the surface of the first clot, but smaller. These clots lay between the *pia mater* and the brain, with no membrane between them. The membrane on the left side was normal in character. Between the convolutions of the brain on the right side, in the *sulsi*, **was** found organized material which had been produced from the blood which was found attached to the membrane. Upon examining the interior of the brain no signs of disease were found. No microscopic examination was made. The post-mortem was with the naked eye, and took place in the underground basement of an undertaking shop by gas light; the time occupied by the post-mortem was between an hour and an hour and three quarters. From the facts here recited, the symptoms described, and the post-mortem disclosed, can you state whether the death of the deceased resulted from external violence or not?

A. I could not state from that as to what the cause of death was.

The same questions were asked four other reputable physicians and were answered in the same way. Rogers, in his valuable work on Expert Testimony (2d Ed.), sec. 49, says: "The opinions of physicians are also received as to the cause of the death of any particular person; such opinions being founded either upon a personal knowledge of the facts of the case or upon a statement of the symptoms of the disease as detailed by others. If such opinions were not received it would be impossible in many cases to prove the cause and manner of death, especially in those cases where there was no one present at the time of death. In such cases the opinions of physicians and surgeons who have made a post-mortem examination of the deceased seem to be necessary in order to ascertain the facts and clear up the mystery." (*Pitts v. State*, 43 Miss., 472;

*State v. Bowman,* 78 N. Car., 509; *Shelton v. State,* 34 Tex., 666; *State v. Baptiste,* 26 La. Ann., 134, 137; *State v. Smith,* 32 Me., 370; *Mitchell v. State,* 58 Ala., 418; *State v. Pike,* 65 Me., 111, 114; *Polk v. State,* 36 Ark., 117, 124; *Powell v. State,* 13 Tex. Ct. of App., 244; *Boyle v. State,* 61 Wis., 440; *Newton v. State,* 21 Fla., 56; *People v. Barker,* 60 Mich., 277; *People v. Foley,* 64 Id., 148; *Schneider v. Manning,* 121 Ill., 376; Max., Cr. Pro., 601.) This no doubt is the law. The difficulty in this case is that no one of the physicians testified positively that the blows inflicted by the plaintiff in error were sufficient to produce death, while they all agree that cerebral hemorrhage may be produced by many causes, and that the habits of life of the deceased, as shown by the testimony, were very liable to produce such hemorrhage. This being the state of the proof, it is not sufficient to show that the plaintiff in error caused her death. It may be said that there is some testimony in support of that theory, and that, as the evidence is conflicting, the verdict will not be set aside. The answer to this is, that the verdict must be based upon the testimony, and there is not sufficient evidence to show the guilt of the prisoner. Like the stream that cannot rise higher than its source, so the verdict of a jury cannot go beyond the evidence. Constitutional guarantees of a fair trial would amount to very little, if courts did not scrutinize the evidence in a case to see that the verdict was based upon it. A blow or series of blows by the open hand are not ordinarily fatal, in fact are rarely so, and it devolves upon the state so to prove that such was the result here. This it has failed to do. The judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

THE other judges concur.