## THE STATE OF IOWA v. E. P. HESSENIUS, Appellant.

**Criminal law:** EXPERT MEDICAL EVIDENCE.  Where an expert medical witness has established his competency he may properly be asked whether from a given state of facts he is able to form and give an opinion as to the result of such facts; as such question does not call for a conclusion as to his ability to pass upon the subject matter of the question.

**Same:** CAUSE OF DEATH.  Where the hypothetical question asked medical experts concerning the cause of death was based upon substantially the same facts as shown by the evidence, they could then be asked what in their opinion caused the death of deceased, without invading the province of the jury; but they should not be permitted to testify that in their opinion the death was feloniously caused.

**Same:** EVIDENCE: ADMISSIBILITY.  Expert testimony is admissible for the purpose of proving particular facts peculiarly within the range of scientific knowledge which cannot be otherwise proven.

**Same:** CONCLUSION.  On a prosecution for murder expert medical witnesses may testify as to what in their opinion was the actual cause of the death; and they are not limited merely to state what in their opinion was the probable or likely cause of the conditions seen by them, or presented by the hypothetical questions.

**Same.**  Where the cause of death is in dispute and necessary to be established an expert medical witness, who is properly qualified to speak, may give his opinion as to the cause of the death, based upon personal examination or in answer to hypothetical questions based upon a personal examination, where such is peculiarly within the knowledge of his profession and is not susceptible of direct proof by any other means.

**Same:** EVIDENCE: RES GESTAE.  A conversation of deceased with a neighbor shortly before her death, touching her family relations and duties, was competent as bearing upon her state of mind and purpose, and was admissible as part of the res gestae.

**Same:** EXPERT TESTIMONY: INSTRUCTION.  An instruction that before weight can be given to expert testimony the jury must find the facts

upon which it is based ''substantially'' true is not erroneous, as leaving the materiality of the evidence upon which the question was based to the determination of the jury.

Same:  MURDER:  FAILURE TO INSTRUCT.  Failure of the court to instruct upon defendant's theory that deceased came to her death accidentally was not reversible error; where defendant requested instructions, but not covering this question, and the only triable issue was defendant's guilt, which depended upon the state maintaining its theory.

Same:  INCLUDED OFFENSES:  INSTRUCTIONS.  Where under no view of the case could defendant have been convicted of a crime less than manslaughter, no instructions as to included offenses below that of manslaughter were required.

Same:  WITHDRAWAL OF ISSUES.  Where the state charged and the evidence tended to show that defendant murdered deceased by means of strangulation, there was no error in refusing to withdraw the charge of murder in the first degree.

Same:  ADMISSION OF IMMATERIAL EVIDENCE.  The admission of evidence having no material bearing on the case and which should have been excluded for that reason was not reversible error.

Appeal:  CONCLUSIVENESS OF VERDICT.  The appellate court will not reverse an appeal on the ground that the evidence does not support the verdict, unless from the whole record it appears that there is such a want of support for the finding as will require that action.

*Appeal from Cherokee District Court.*—HON. WILLIAM THEOPHILUS, Judge.

TUESDAY, MARCH 24, 1914.

TRIAL upon an indictment for murder.  From a verdict and judgment of conviction of manslaughter, the defendant appeals.—*Affirmed.*

*Herrick & Herrick* and *Faville & Whitney,* for appellant.

*George Cosson,* Attorney General, and *John Fletcher,* Assistant Attorney General, for the State.

WITHROW, J.—I. The defendant was charged with murder in the first degree, in having on the 31st day of January, 1912, killed his wife by strangulation by means unknown. The trial resulted in a verdict finding him guilty of manslaughter, and from a judgment upon the verdict this appeal is brought. The claim of the defendant was that his wife came to her death by an accidental fall from a porch, from the second story of the house, to a concrete sidewalk immediately below. No eyewitnesses testified to the immediate act or accident resulting in her death.

In the evidence introduced on the part of the state as to the circumstances immediately surrounding the death of Mrs. Hessenius, that of one Harvey Geibe was as follows:

My occupation in January last was hauling cream. I was at the Hessenius home that day between ten and eleven in the forenoon. When I first went to the home that morning, I saw the defendant coming from the house. He came out with the cream to the gate and stepped a couple of steps to the south to meet me, and I was standing in the back of my wagon, and he set the cream in front of me, and I said, 'Good morning,' and he said 'Good morning,' and he turned around and went back to the house. I got out and set the cream on the walk and took a bottle out and put his number on it; and then Mr. Hessenius came out and told me his wife had slipped and hurt herself, and for me to run and tell the neighbors. I didn't ask him any more, but went. He said he tried to get them over the telephone but couldn't. I went to Jim Lowry's place about a quarter of a mile east and delivered his message to Mr. Lowry, turned around, and drove over to Hessenius' place for the cream I had left there, and put the cream on the wagon, and put his weights down, and I thought I would step to the house and tell him I told Lowrys. I saw blood there, and I walked in; I saw the blood just off the porch, the south porch, on the sidewalk. When I went in, I saw Ernest sitting there beside his wife, who was lying there on the floor. Her face was black, she was lying on her back with her hands beside her. Mr. Hessenius was down beside her putting cold water on her throat with a cloth. When I came in, he said, 'Do

you think she is dead?' And I said, 'It looks very much like it.' I turned around and went out this dining room door that I had come in, and said I would go after Lowrys with my team. After I came out of the dining room door I went onto this south porch alone, and Ernest came after me, and said: 'Don't go. Stay here with me. People will think I done it.' I said, 'O, no, Ernest! People wouldn't think anything like that of you.' He didn't seem to be excited very much. He was sitting there putting the water on her. After he had asked me if I thought she was dead or not, he started to cry then. I didn't see any one else in the house there except Mr. Hessenius, and Mrs. Hessenius lying on the floor at that time. After Mr. Lowry and his wife came, I saw the little girl.

Cross-examination of this witness developed more details not necessary to our present purpose.

J. H. Lowry, who was called by Geibe, testified:

When I arrived at the Hessenius home, it was about eleven o'clock. I met Mr. Geibe in the yard when Mrs. Lowry and I drove in. I went right into the house and found her lying on the floor of the kitchen. She looked dead to me. I saw the defendant when I went into his home at that time. He was kneeling down close by his wife. I don't think that I said anything to him when I went into the house and into the kitchen. After a little bit he said to me that his wife fell off the porch. Where Mrs. Hessenius was lying was wet and bloody. There was blood flowing all over the floor. The defendant was kneeling or sitting by his wife bathing her face and the wounds with a cloth. I observed the wounds upon her face at that time. I don't know that I can just tell the real location, but they were on the side of the forehead around what we call the temples. I noticed Mrs. Hessenius' face at that time. It was dark. The lips seemed to be swollen, and her eyes seemed to be swollen. It was dark and swelled. I don't think I could see the pupils of her eyes. The face was bleeding some at that time. The color of her face in life was not the same as it was this time that I saw her. Her face appeared to be black or purple. I observed marks or rings upon her

throat or neck. I didn't examine the back of her neck or lift her head or body at that time. The face and neck was all dark. I don't know as I noticed the condition below that. Mrs. Hessenius wore a loose turned-down collar. The face had kind of a bloated appearance, and the lips appeared to be swollen. I don't think I noticed any marks or bruises or cuts or dents upon the lips. I did not observe her hands or arms or fingers or any contusions on them.

The witness testified to seeing blood on the porch, on the sidewalk and snow just outside the house to the south, and that it appeared to be centered in one place. It was also on the floor of the dining room, and in other places about the house, and on the lace curtain of the door, above the knob, and there were pieces of broken glass over the floor. He testified that defendant wandered through the house, moaning and crying; that he (the defendant) said he was in the barn when he first heard a scream or noise; and that he came into the house and found her lying on the dining room floor. He said he thought she had been hurt by falling from the porch immediately above the walk on which there was blood.

The evidence of Mrs. Lowry as to conditions about the house was of similar import.

Dr. Ihle, who was called to the house, described the condition of Mrs. Hessenius. Her face was purple; eyes, nose, and lips swollen; tongue protruding beyond the point of her teeth; a heavy dark black ring around her neck. He asked the defendant how it happened, and he said he thought she fell off the front porch. The witness found a cut into the skull at the border of her hair, a wound under the right temple, and a cut under the eyebrow. The eyeballs were protruding. He testifies to having seen tracks in the snow on the balcony or upper porch, but remembers one set only, and near the railing it appeared as though a foot had slipped. There also was evidence to the effect that near the walk below the porch, and near by where blood was seen upon the snow, broken pieces of an earthen vessel were found.

Further evidence on the part of the state, developed from the post mortem examination, was to the effect that the brain was normal throughout, with the exception that it contained an excessive supply of blood. The medulla was congested, but aside from that was normal. There were no fractures of the spinal column and no discoloration of the bones composing the spinal column. The spinal cord was normal throughout its entire length, not being broken or fractured at any place or in any way whatever. There were no fractures of the skull. All of the organs of the body were practically normal. There was a settling of blood in the lungs, especially in the back part. Beginning at the back of the tongue and over the entire pharynx was a ecchymotic spot. This spot involved the top layers of the epiglottis. The front part of the epiglottis was normal, except near where it was attached, and on this part there were ecchymotic spots the same as on the back of the tongue. The esophagus was normal. The windpipe was normal near the point where it joins the lungs, but up near the larynx there were two black and blue spots, one on each side. The left one was about one-eighth by one-sixteenth of an inch and the right one somewhat smaller. The Adam's apple contained a couple of small black and blue marks just below the vocal cord.

These conditions developed in more detail were the basis of opinion given by expert witnesses as to the cause of death; those on the part of the state stating it to have been strangulation, and on the part of the defense that it probably resulted from a fall.

Evidence introduced on the part of the state tended to show that there had been discord in the domestic relations of the parties, and it is the claim of the state that the immediate provocation to the act which it charges against the defendant arose in the desire of Mrs. Hessenius, on the day of her death, to go to a church dinner. We need not more fully go into the evidence upon this branch of the case. While the facts tended to show domestic troubles, they were not admitted by

the defendant, excepting as to some instances, and these remote from the time under inquiry; and it was his claim, with evidence tending to support it, that in the more recent period up to the time of her death their relations had been harmonious.

The sheriff of the county testified that he saw the defendant at his home on February 2d, when the county attorney and physicians were there. He states that at the time the county attorney said to the defendant, after inquiries had been made of him as to the circumstances and his acts, "Hessenius, you have choked your wife to death," and that the defendant made no reply, but went to get a drink of water.

II. The foregoing statement presents as much of the record of the evidence as is necessary to a proper understanding of the errors urged.

Upon the trial two distinct theories were urged as to the cause of death: That by the state, that it was caused by strangulation; of the defense, that it resulted from accidental fall. The evidence tending to sustain both theories was almost entirely circumstantial, but there was substantial support for both. Aside from the presence of the defendant at or near by at the time to the place where death occurred, no witness testified to facts immediately connected with it. Upon the theory of the state, the death was feloniously caused; and, because the defendant was the only one shown to have been in such proximity to the scene as to permit connection with the alleged act, coupled with statements and silence when accused, which are claimed to have the legal effect of admissions, and with evidence upon which is based the claim of the existence of a motive by him, the ultimate question upon which the prosecution relied as demanding a conviction was that the death of Mrs. Hessenius resulted from strangulation and from wounds made in connection with such act at the hands of defendant, her husband, acting willfully through malice, deliberation, and premeditation with the intent to take her life.

Medical witnesses were examined as experts. Shortly after the death of Mrs. Hessenius an autopsy was held, and the physicians who were present and assisted in it testified in detail as to the condition of the body, the internal organs, and the blood vessels. A hypothetical question was propounded to the several witnesses called by the state to testify as experts, some of whom had not assisted at the autopsy, each being first asked, as a part of the question, whether upon the assumed facts thus stated he would be able to give an opinion as to the cause of death. To each the objection was made that the question called for a conclusion and opinion of the witness as to his own ability to pass upon a matter such as was embraced in the inquiry. The objections were overruled, and the different witnesses answered, in substance, that they were able to form and to give an opinion on the state of facts presented in the hypothetical question, and error is assigned against the rulings permitting them to so answer. The preliminary interrogatory propounded to the expert witnesses, and to which objection was made, was not as to qualifications which would fit them to testify as experts, but whether upon the facts assumed and presented in the question they would be able as experts to give an opinion as to the cause of death. Preceding this must have been and were statements as to the learning, practice, and experience of the witnesses in their profession, from which it was the duty of the trial court to determine whether competency to testify as persons skilled in medicine and in knowledge of the particular matter then under inquiry had been shown; and this was determined before permitting them to so testify. Whether upon a given state of facts they would be able to give opinions as to the results of such facts was merely the statement that the assumed facts were such that to the trained mind they carried knowledge upon which an opinion could be based. It is quite different in effect from an interrogatory as to whether the witness is in fact qualified to testify as an expert; such is readily and

1. CRIMINAL LAW: expert medical evidence.

logically distinguishable from an inquiry whether to the witness as an expert certain facts or conditions admit of a scientific conclusion or opinion as to their effect. The questions were not objectionable in the respect claimed.

III. Medical witnesses who assisted at the post mortem were interrogated as to what in their opinion caused the death. To other medical witnesses the hypothetical questions pro-

2. SAME: cause    pounded were based substantially upon the
of death.         conditions revealed by the post mortem ex-

amination, and sufficiently met the objection that no proper foundation had been laid. The ultimate question propounded to the several experts was: "Doctor, assuming that the statement of facts incorporated in the last question that I gave you to be true, what do you say in your opinion caused the death of that person?" To this was made the objection that it called directly for a conclusion and opinion of the witness regarding the ultimate question to be determined by the jury in this case, and invaded the province of the jury, permitting the witness to speak and direct the jury as to the ultimate and final facts on which they alone are entitled to pass. In each instance the objection was overruled, and the witnesses testified that in their opinion death resulted from strangulation, or, as stated by some of them, by external violence applied to the neck. Error is urged because of admitting such questions and answers.

It is the claim of the appellant that, there being no dispute as to the fact of the death of Mrs. Hessenius, the sole question in the case was what caused her death. That such apparently resulted from violence of some nature, either criminal or from accident, was manifest. Which of them was the actual cause was the subject of inquiry. To sustain the theory of the state, and as a necessary element to establish the corpus delicti, it was required to be shown that death resulted from a cause or causes as charged, behind which was the criminal purpose of some one. It was not sufficient to warrant a conviction that it be shown that her death re-

sulted from strangulation; but it also was required to be established by the evidence that the defendant was the cause of the conditions which produced death, and that he was prompted by the intent necessary to constitute a crime. While without proof of death by the means charged there could be no conviction, neither could guilt be established without the connecting proof which fixed liability upon the defendant. The inquiry of the expert witnesses did not call for nor would they be permitted to testify that in their opinion the death resulted from felonious causes, but was limited to a single fact relating to one element of the case only.

The theory upon which the testimony of expert witnesses has been held admissible in certain cases is that the subject-matter of the particular inquiry is so peculiarly within the range of scientific knowledge or special training that to exclude it would work a denial of the only proof competent to establish the fact. This principle is well stated in *Shelton v. State,* 34 Tex. 662, as follows: "The opinion of a medical man as to the cause of the death of the child, and also as to whether the neck of the child was broken before or after death, was properly admitted by the court to go to the jury. Indeed, there are many cases, as in this, where there was no one present at the death but the deceased, unless it was the defendant, and where it might be wholly impossible to prove the cause and manner of the death, excepting through the aid of science; when, with the aid of scientific experience of medical men, the whole facts might become as manifest as though rehearsed by an eyewitness."

3. Same: expert evidence: admissibility.

The appellant does not, of course, challenge the right to use expert testimony under proper limitations for purposes recognized by the law, but relies upon the contention embraced in the objection to the testimony under consideration, and as more fully developed in argument, that the witnesses should have been permitted to testify only to what was the probable or likely cause of the

4. Same: conclusion.

conditions seen by them, or which were presented in the
hypothetical question, and not as to what in their opinion
was the actual cause.

Upon this question the authorities are in some confusion,
resulting in many instances from a failure to distinguish be-
tween that which from the exhibited or described conditions
speaks to the trained mind as a natural and scientific result
of certain moving causes, and that which by connection with
other proof or circumstances or by direct response to the
interrogatory relates to the author of causes, or the partic-
ular instrumentality which brought about the result.    The
rule which the state claims must govern as to the admis-
sibility of testimony of this character is stated in Wharton
on Homicide (3d Ed.), page 907: "So the opinions of med-
ical experts that death was from strangulation caused by
external force, leaving an outward impression, is sufficient.
And medical testimony that a wound caused death, and that
a disease or various diseases combined to produce that result,
and that they were produced by the wound is sufficient in a
prosecution for homicide to establish the corpus delicti."
Supporting these propositions, the author cites *Common-
wealth v. Bell*, 164 Pa. 517 (30 Atl. 511), and *Powell v. State*,
13 Tex. App. 244.   Also, in Underhill on Criminal Evidence,
paragraph 313, the same rule is recognized in the statement
in the text that a physician, who conducts an autopsy to
ascertain the cause of death, after the facts are revealed to
him, may give his opinion based thereon as to the cause of
death, citing authorities which support the conclusions; and
the same rule is stated in Greenleaf on Evidence, paragraph
440.   This rule has been recognized in many states, in cases
where death was alleged to have resulted from poison, from
abortion, strangulation, and causes of that nature, and to
determine which required upon the facts developed in the
particular cases the application of scientific and trained
knowledge which the jury could not be presumed to have.
In *State v. Harris*, 63 N. C. 1, in a trial for murder, the

theory of the defense being that death resulted from burns, a medical expert witness was permitted to testify that in his opinion the burns occurred after death.     In *People v. Hare,* 57 Mich. 505 (24 N. W. 843), the theory of the state was that death resulted from stabbing, although the body was found in water, and upon this fact was based the theory of the defense that death resulted from drowning.    An expert witness was asked, ''From the appearance of the wound, what would you say it was caused by?''    But he was not permitted to answer; but he was allowed to answer the question whether the visible wound was committed in life or after death.    In *Zoldoske v. State,* 82 Wis. 580 (52 N. W. 778), a poison case, the expert witness was permitted to answer the question, ''What was the cause of death?'' the facts and conditions developed by the post mortem examination having been assumed in the question propounded to him.    In a like case *(People v. Bowers* [Cal.], 18 Pac. 660), two theories were advanced; that of the state being death from poison, and of the defense that it resulted from abscess of the liver. The question to the expert, ''What caused the death?'' was objected to, as here, upon the ground that it invaded the province of the jury, and determined the precise question. The objection was disposed of by that court in holding that it inquired what caused the death, not who caused it, and that it was competent and admissible.    In support of the rule now under consideration, see, also, *State v. Lee,* 65 Conn. 265, 30 Atl. 1110 (27 L. R. A. 498, 48 Am. St. Rep. 202) ; *People v. Durrant,* 116 Cal. 179 (48 Pac. 75) ; *McNamee v. State,* 34 Neb. 288 (51 N. W. 821) ; *People v. Barker,* 60 Mich. 277 (27 N. W. 539, 1 Am. St. Rep. 501) ; *Shelton v. State,* 34 Tex. 662; *State v. Smith,* 32 Me. 370 (54 Am. Dec. 578) ; *State v. Wilcox,* 132 N. C. 1120 (44 S. E. 625) ; *Davis v. State,* 54 Tex. Cr. R. 236 (114 S. W. 366) ; *Commonwealth v. Crossmire,* 156 Pa. 304 (27 Atl. 40, 41).    Close in point upon the question here presented is *People v. Foley,* 64 Mich. 148 (31 N. W. 94), in which, on the charge of murder of a child by the father,

the expert was permitted to answer a hypothetical question, stating in his opinion the cause of death to have been asphyx-. iation or suffocation, aided by extensive injury to the brain. The authorities cited are in harmony with the great weight of judicial expression upon this subject; but, as we have noted, some courts have held to the rule requiring such questions to be limited to the probable cause of death. Of this latter class is the recent case of *State v. Hyde,* 234 Mo. 200 (136 S. W. 316, Ann. Cas. 1912D, 191). In that case the theory of the state was that decedent came to his death from poison, criminally administered. The theory of the defense was that death resulted from uræmic poison or old age; and each theory was, as here, supported by the testimony of experts. That court held that the answer to a question calling for the opinion of the experts as to what the decedent suffered and died from was erroneously admitted, for that, the corpus delicti being hotly contested, the experts should have been permitted to testify to no more than what might have produced the condition. Supporting its opinion, that court cites only decisions of its own state, although, as we have said, there are other jurisdictions which hold to that rule, but they are not in accord with the weight of authority. We think the conclusion of that court fails to recognize the reason for the rule as very generally given, and as is clearly stated in *Shelton v. State, supra.*

It is claimed by the appellant's counsel that this court is committed to the rule for which they contend, holding that, in cases involving inquiry into cause of death, the question to expert witnesses must be as to the probable and not the actual cause of death, or, as applied to cases not based upon death, that inquiry may not be made as to the ultimate fact. In *State v. Rainsbarger,* 74 Iowa, 196-204, the expert witness was asked for an opinion as to how certain wounds upon the decedent were probably made. This court held that the exclusion of the evidence was proper, as the matters to which it related

5. SAME.

were not peculiarly within the knowledge of the witness or the profession to which he belongs. The statement of the conclusion of this court upon that ruling recognizes the distinction which admits expert testimony, i. e., a special knowledge not possessed by the jury, qualifying the witness to so speak. *Sachra v. Town of Manilla,* 120 Iowa, 562, was an action for damages. The questions to the expert witnesses were as to whether certain causes would or might produce a given effect; the action in which it arose being to recover for personal injuries alleged to have resulted from negligence. The questions and their answers were held to have been competent, this court holding that experts might give opinions as to the probable cause of a given effect; that what in fact causes a wound or injury is a question for the jury, but what might or might not have caused it is a matter upon which expert testimony is competent. But stating that there was a distinction to be kept in mind as to opinions, that case cited *State v. Seymour,* 94 Iowa, 705, which held that a physician who attended the deceased after his injuries, and who was asked whether in his opinion the wound was inflicted by a club or was due to a fall, was properly permitted to answer the question. The rulings in the *Sachra* case were correct, and the decision cannot properly be claimed as authority beyond the question there directly presented.

*Martin v. Light Company,* 131 Iowa, 724-739, was brought upon the theory that the deceased came to his death from an electric shock, resulting from the negligence of the defendant. The deceased had been, and was at or immediately preceding the time of his death, attending to some duty at the switchboard, and while so engaged, it was claimed, received a shock resulting in his death. An electrical expert was asked, "From your knowledge of electrical laws, and from the machinery there, and from what you saw, what is your opinion as to whether or not Bass received an electric shock before he fell?" The answer was that in his opinion he did. This court held that an objection to the question should have been sustained,

as it called for an ultimate fact, inherent in the verdict, and holding that it is the province of the jury alone to draw the ultimate conclusions, but recognizing that it is not always easy to draw the line between that which is and that which is not admissible under the rule. Although apparently supporting the contention of the appellant, we think that case is not wanting in harmony with the cases we have cited, nor with the decisions of this court to which we shall later refer, when applied to the particular inquiry then being made.

In *Bruggeman v. Railway Co.*, 147 Iowa, 196, the engineer of the locomotive of the train which caused the injury was asked if he could have stopped the train in any shorter distance than he did on that particular day, etc. These questions were held to have invaded the right of the jury to determine the fact in controversy, not asking for the time or distance within which the train might have been stopped when running under such conditions. It in effect asked the conclusion of the engineer as to whether he was negligent. *Strever v. Woodard*, 141 N. W. 931, 46 L. R. A. (N. S.) 644, decided by this court, was an action for personal injuries. The rule was there recognized that expert testimony could be used as an aid in tracing effects to an efficient cause, and the exclusion of evidence tending to so do was erroneous; that, while the witness could not testify as to the cause of the injury, he should have been permitted to testify as to the results which would or might flow from it. The action was based upon negligence, resulting in injury to the head of the plaintiff, and from such injury, the external evidence of which was observed by the witness, he was asked to state whether continual headaches would result; there having been evidence upon which to base the question. The trial court refused to admit the testimony, and upon appeal this court held that it should have been received, as the subject was one not familiar to the jury, and that such evidence was competent to trace the connection between the ailments and the cause. That conclusion was probably based upon the statement that the subject was

one not familiar to the jury, and that expert testimony was proper in tracing the connection between certain conditions and an efficient cause. The case does not sustain the position of the appellant.

We turn to the other cases decided by this court: *State v. Morphy,* 33 Iowa, 270, was a trial under an indictment for murder. Expert witnesses were asked to state their opinion from an examination of the body of deceased as to what was the cause of death, with what kind of an instrument were the wounds inflicted, and whether the wounds produced the inflammation of the brain which had been testified to as the immediate cause. The questions were held to be proper; the court saying: "The jury must judge of the facts for themselves, but that, whenever the question depends on the exercise of peculiar skill and knowledge that may be made available, it is not a decision by the witness on a fact to the exclusion of the jury, but the establishment of a new fact, relation, or connection, which would otherwise remain unproved. Not to admit such evidence would be to reject what is essential to the investigation of truth." Questions calling for like conclusions were asked experts in *State v. Porter,* 34 Iowa, 131, and were approved; the court following the rule of *State v. Morphy, supra. State v. Tippet,* 94 Iowa, 649, and *State v. Seymour,* 94 Iowa, 705, also recognize and hold to the rule of the *Morphy* case. As applied to a case resulting in death, when the cause of death is necessary to be established and is in dispute, whether it be in civil or in a criminal action, we are satisfied that it is a correct and often necessary rule that from the results of a personal examination, or in answer to a hypothetical question based upon such results, a physician whose qualifications entitle him to speak as an expert may from the conditions exhibited or stated to him give his opinion as to the cause of death, where such is peculiarly within the knowledge of his profession, and is not susceptible of direct proof by any other means. Upon the theory of the state in this case that death was caused by strangulation, it was necessary to prove that fact; and, in the absence of eyewitnesses,

it was competent to show the condition of the body and its organs, and if from such there followed to the trained mind of the expert a conclusion not evident to the jury or to the unskilled in the particular matter under inquiry, if to such witness the conditions apparent or described to him spoke of a natural cause, when viewed in the light of science, his opinion as to such cause is competent. There was no error in admitting the testimony.

IV. Error is charged in admitting evidence of a conversation which a neighbor woman had over the telephone with Mrs. Hessenius during the forenoon and but a short time before her death. It related to a plan for attendance upon a church function that day, and in which Mrs. Hessenius expressed doubt whether her husband would be willing to get his own dinner. The theory upon which the testimony was offered was that it tended to show her state of mind and purpose at a time but shortly before her death, and in connection with other testimony as to alleged inharmonious family relations was competent as bearing upon the question of motive and also as a part of the act itself. The particular objection made to the testimony is that it was hearsay. As a substantive fact it was competent to show the purpose of the deceased at a time but shortly preceding her death, as a part of the res gestæ, although it may not have been immediately concurrent in point of time. This court has heretofore said that it is sufficient if it is near enough to clearly appear to be spontaneous and unpremeditated, and free from sinister motives. *State v. Jones,* 64 Iowa, 349. We think there was no error in admitting the testimony.

6. Same: evidence: res gestae.

V. In instruction No. 19 given by the trial court as to the expert testimony, and the weight which should be given to it, the following language was used: "And before you can give any weight whatever to expert testimony you must first find from the evidence that the facts upon which it is based are substantially true." The criticism is of the use of the word

7. Same: expert testimony: instruction.

"substantially"; the claim of the appellant being that it differs in no respect in meaning from the word "materially," the use of which in a like connection has been condemned by this court. In *Stanley v. Taylor*, 160 Iowa, 427, this court held to be erroneous an instruction which left to be determined by the jury the materiality of the evidence upon which a hypothetical question was based; and the cases holding in support of that conclusion were there cited. But we never have held that an instruction like that now criticised was erroneous because of that as the alleged fault. *Hall v. Rankin*, 87 Iowa, 261, cited by counsel for appellant, contained a clause similar to that now objected to, advising the jury that if the assumed facts were not substantially correct, etc., such should be considered in determining the weight to be given to the testimony. For other reasons not related to that, the instruction was disapproved, and the case is not authority supporting appellant's position. Testimony may be substantial which goes to the question of its weight as bearing upon the issues. It may be material, which is the test to determine whether it may be considered at all in the case. It may be material as to one issue, and immaterial as to another question to be determined. A recitation of the evidence in a question to an expert witness may include all that has bearing upon the case, it may include that which has not been proven, or it may omit some parts which should be included. The instruction did no more than to tell the jury that all that which served as a basis for the question must be substantially true or proven, which but called their attention to the fact that omissions or facts assumed which were not found to be proven would weaken the force of the answers. The materiality of any element of the question was not suggested, nor do we think it could be so inferred by the jury. The instruction is not open to the criticism made against it.

VI. In the instructions given to the jury the trial court made no reference to the theory and claim of the defendant

that the death was the result of accidental fall. That theory

8. SAME: murder: failure to instruct.

had support in the evidence from circumstances disclosed upon the trial, and expert witnesses called by the defense testified that the death of Mrs. Hessenius could have resulted from that cause. It is claimed by the appellant that it was the duty of the trial court to instruct upon that theory, as well as upon the theory advanced by the state, and that this duty existed whether such instructions were requested by the defense or not. By the state it is urged that in the absence of a request for such instructions error cannot be lodged for that reason against those which were given. In this case counsel for the defendant presented requests for instructions, but none of those requested related to that which is now the subject of their criticism. In *State v. O'Hagan,* 38 Iowa, 506, this court held that to omit to give instructions upon an essential part of the case was error, calling for a reversal. In the later case of *State v. Lightfoot,* 107 Iowa, 344, it was held that the failure of the trial court to refer to an alleged alibi, when no request therefor was made, was not error. Applying the rule last stated to this case in which instructions were requested, but not upon the point covering the theory of the defense, while recognizing that all issues should be fairly and clearly stated to the jury, yet as the only issue triable was as to that of defendant's guilt, and this depending upon the state maintaining its theory, we cannot hold as reversible error the failure to so instruct.

VII. It is charged that there was error in not instructing the jury as to the included offenses below that of manslaughter. That death resulted from some cause was undis-

9. SAME: included offenses: instructions.

'puted. If it was as charged by the state, there was no possible view of the case, for the crime to have been lower than manslaughter. In such instances instructions as to lower included crimes are not required. *State v. Van Tassel,* 103 Iowa, 6; *State v. Cater,* 100 Iowa, 501.

VIII. It also is urged that there was error on the part of the trial court in refusing to withdraw from the jury the charge of murder of the first degree. If the jury found that a crime had been committeed under the circumstances claimed by the state and which the evidence tended to establish, and that the defendant was responsible for it, the facts and circumstances afforded such basis as would warrant a submission of the higher degree. There was no error in this refusal. *State v. Fuller,* 125 Iowa, 212; *State v. McPherson,* 114 Iowa, 492.

10. SAME: withdrawal of issues.

IX. A witness for the state testified to having found on the floor in the kitchen, shortly after the death of Mrs. Hessenius, a small piece of looking glass upon which was a spot. This was turned over to a microscopic expert, who subjected it to examination and analysis and reached the conclusion and so testified that the spot was in his opinion chicken blood. The relation, if any, which it had to the death, is not clear. That there was blood in the house is not disputed. There was a theory suggested by the state, as we gather it from the record, that the defendant had killed a chicken and spilled its blood upon the floor to conceal the fact that he had killed his wife, or that it possibly accounted for the blood outside the house. But the connection is so remote and doubtful it has no apparent relation to the fact of death. While we think this evidence could have been excluded as entirely without material bearing on the case, its admission was not error.

11. SAME: admission of immaterial evidence.

X. Appellant's counsel urge with much force that the evidence is insufficient to warrant the verdict of the jury. It is not given to the appellate court as a matter of right and power to substitute its conclusion upon facts in cases where a jury has returned its verdict, unless from the whole record it appears that there is such a want of support for the finding as to require that action. This case, as do almost all criminal

12. APPEAL: conclusiveness of verdict.

cases where there is sharp dispute, presents many difficulties
in determining what are the facts, in applying the proven
facts to the respective theories as to cause of death advanced
at the·trial, and in concluding from all the facts and circum-
stances the ultimate question of guilt, or such reasonable
doubt of it as would compel an acquittal.   These matters
were peculiarly for the jury.   It would serve no proper
purpose for us to express an opinion upon the evidence,
unless from it we could also say that the jury, in the
proper discharge of its duties, should have solved the prob-
lem in another way.   This we cannot do.

The case was one properly for the jury, its finding has
support in the evidence, there appears no error, and the
judgment of the trial court must be—*Affirmed.*

LADD, C. J., and DEEMER and GAYNOR, JJ., concur.